**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 17-2295

BOARD OF TRUSTEES, SHEET METAL WORKERS' NATIONAL PENSION
FUND,

Plaintiff – Appellant,

and

BOARD OF TRUSTEES, INTERNATIONAL TRAINING INSTITUTE FOR THE
SHEET METAL AND AIR CONDITIONING INDUSTRY; BOARD OF
TRUSTEES, NATIONAL ENERGY MANAGEMENT INSTITUTE
COMMITTEE; BOARD OF TRUSTEES, SHEET METAL OCCUPATIONAL
HEALTH INSTITUTE TRUST FUND; BOARD OF TRUSTEES, SHEET
METAL WORKERS' INTERNATIONAL ASSOCIATION SCHOLARSHIP
FUND; BOARD OF TRUSTEES, NATIONAL STABILIZATION AGREEMENT
FOR THE SHEET METAL INDUSTRY TRUST FUND,

Plaintiffs,

v.

FOUR-C-AIRE, INC.,

Defendant – Appellee.

------------------------------

BAKERY AND CONFECTIONERY UNION AND INDUSTRY
INTERNATIONAL PENSION FUND,

Amicus Supporting Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at
Alexandria. Liam O'Grady, District Judge. (1:16-cv-01613-LO-IDD)

Argued:  January 30, 2019                                    Decided:  July 3, 2019

Before NIEMEYER, AGEE, and DIAZ, Circuit Judges.

Reversed, vacated, and remanded by published opinion. Judge Agee wrote the opinion, in which Judge Niemeyer and Judge Diaz joined.

**ARGUED:**  Lauren Powell McDermott, MOONEY, GREEN, SAINDON, MURPHY & WELCH, PC, Washington, D.C., for Appellant. Joseph Ray Pope, WILLIAMS MULLEN, Richmond, Virginia, for Appellee.  **ON BRIEF:**  John R. Mooney, Diana M. Bardes, MOONEY, GREEN, SAINDON, MURPHY & WELCH, PC, Washington, D.C., for Appellant.  Michael E. Avakian, WIMBERLY, LAWSON & AVAKIAN, Washington, D.C., for Appellee.  Julia Penny Clark, Richard F. Griffin, Jr., BREDHOFF & KAISER, PLLC, Washington, D.C., for Amicus Curiae.

AGEE, Circuit Judge:

The Board of Trustees of the Sheet Metal Workers' National Pension Fund (the "Fund"), a multiemployer pension plan, filed this suit claiming a delinquent exit contribution from Four-C-Aire, Inc., a former participating employer, pursuant to § 515 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1145. After the district court granted Four-C-Aire's motion to dismiss, the Fund appealed. Because the Fund's governing agreements (the "Trust Documents") and Four-C-Aire's collective bargaining agreement (the "CBA") require participating employers to pay an exit contribution when they no longer have a duty to contribute to the Fund due to the expiration of the underlying CBA, the complaint alleges a viable claim. We therefore reverse the district court's order granting the motion to dismiss, vacate the judgment as to the exit contribution claim, and remand for further proceedings consistent with this opinion.

I.

Before turning to the specific facts of this case, we review how multiemployer pension plans like the Fund operate and the law that governs them. As the name suggests, "[i]n a multiemployer pension plan, multiple employers [from within an industry] pool contributions into a single [trust] fund that pays benefits to covered retirees who spent a certain amount of time working for one or more of the contributing employers." *Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Just Born II, Inc.*, 888 F.3d 696, 698 n.1 (4th Cir. 2018) (internal quotation marks omitted). When an employer executes a CBA

3

with a local union governing the terms of employment, the CBA will often require the employer to contribute to such a plan. Thus, in addition to signing on to a CBA with the union, an employer will also sign on to the terms and conditions of the plan's separate governing documents. But, as discussed further below, the plan is not a party to the CBA between the employer and union.

Plan participation provides multiple advantages to both employees and employers. Among them, employees receive benefits that follow them throughout jobs within a particular industry, and employers are able to offer those benefits while taking advantage of cost- and risk-sharing mechanisms. *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust Fund for S. Cal.*, 508 U.S. 602, 606 (1993).

But participation by an employer in a multiemployer pension plan is not without its risks and obligations. For example, if one participating employer fails to make a contribution to the plan—whether because their CBA has expired, they have gone out of business, or otherwise—the remaining employers must then make larger contributions or employees must receive reduced benefits to cover the shortfall. These "rising costs may encourage—or force—further withdrawals, thereby increasing the inherited liabilities to be funded by an ever-decreasing contribution base." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 722 n.2 (1984) (internal quotation marks omitted). "This vicious downward spiral may continue until it is no longer reasonable or possible for the pension plan to continue." *Id.*; *see also Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1151 (7th Cir. 1989) (en banc) ("Multi-employer plans are defined-contribution in, defined-benefit out. Once they promise a level of benefits to

4

employees, they must pay even if the contributions they expected to receive do not materialize[.]").

To address these risks, Congress amended ERISA by enacting the Multiemployer Pension Plan Amendments Act of 1980 (the "MPPAA") with the goal of stabilizing plans that had suffered financial setbacks when participating employers ceased contributing to the plan. H.R. Rep. No. 96-869(I), at 71 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 2918, 2939 (reporting that the MPPAA was designed to "protect the interests of participants and beneficiaries in financially distressed multiemployer plans" and ensure benefit security to plan participants). Relevant here, the MPPAA provides a separate federal cause of action permitting multiemployer plans to collect contributions from employers so long as the plan is able to establish an obligation to contribute under the terms of the plan's governing documents or the CBA: "Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a [CBA] shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." ERISA § 515, 29 U.S.C. § 1145; *see also Laborers Health & Welfare Trust Fund for N. Cal. v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 547 (1988) ("The liability created by § 515 may be enforced by the trustees of a plan by bringing an action in federal court pursuant to § 502."); *Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1021 (4th Cir. 1997) (stating that § 515 "creates a federal right of action independent of the contract on which the duty to contribute is based" (internal quotation marks omitted)).

With the enactment of the MPPAA, Congress placed multiemployer plans in a stronger position to collect outstanding contributions "than they [would] otherwise occupy under common law contract principles." *Ralph's Grocery*, 118 F.3d at 1021. Ordinarily, any suit brought by a plan for contributions would be subject to common law defenses—such as the parties' intent, fraud in the inducement, or mistake of fact—that the employer could assert against the local union. *Id.* (noting that although third party beneficiaries to a contract—which multiemployer pension plans are similarly situated to in the context of a CBA—can enforce contract terms that inure to their benefit, they are also "subject to defenses that the promisor could assert against the original party to the contract"). But under § 515,

> a multiemployer plan can enforce, *as written*, the contribution requirements found in the controlling documents . . . . Consequently, an employer is not permitted to raise defenses that attempt to show that the union and the employer agreed to terms different from those set forth in the agreement. Nor is an employer permitted to raise defenses that relate to claims the employer may have against the union[.]

*Id.* (emphasis added) (internal citations omitted).

As *Ralph's Grocery* explained, this favored status arises from the interaction between § 515 and longstanding interpretative principles that federal courts apply to CBAs. Generally, we employ federal labor law to construe the terms of a CBA. *See Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 456 (1957). Thus, we will apply "traditional rules of contract construction" to CBAs and plan documents "only when they do not conflict with federal labor law." *Ralph's Grocery*, 118 F.3d at 1025; *see also M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933 (2015) ("We interpret [CBAs],

6

including those establishing ERISA plans, according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy."). Consequently, § 515—as a statement of federal labor policy—bestows favored status on multiemployer plans, allowing them to collect contributions from employers by enforcing the contribution requirements "in accordance with the terms and conditions" of the plan or CBA. 29 U.S.C. § 1145. Section 515 thus "strengthens the position of multiemployer plans by holding employers and unions to the literal terms of their written commitments. [This means that] the actual intent of the contracting parties (i.e., the employer and the local union) is immaterial when the meaning of [the] language is clear."[1] *Ralph's Grocery*, 118 F.3d at 1021. In sum, even if an employer could assert a valid common law defense, it must give way to the plain language of the CBA or governing plan documents.[2]

---

[1] Of course, the intentions of the parties and the contractual language will often align. For example, the Supreme Court has held that in the context of labor negotiations, "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement," but a CBA may provide "in explicit terms that certain benefits continue after the agreement's expiration." *M & G Polymers*, 135 S. Ct. at 937 (internal quotation marks omitted). Because the parties' written agreement is "clear and unambiguous" on that point, that language governs as an expression of the parties' intent. *Id.* at 933 (internal quotation marks omitted). After all, language providing that a particular obligation or benefit survives the CBA's expiration fairly demonstrates the parties' intent on that point.

[2] That said, most circuit courts—including this one—have recognized that some contract defenses can be raised in a collection action for delinquent contributions. One such defense is that a plan fiduciary cannot "enforce a nonexistent contractual obligation." *Ralph's Grocery*, 118 F.3d at 1022 (internal quotation marks omitted); *see also Gerber Truck Serv.*, 870 F.2d at 1153 (observing that § 515 was designed to preclude only "complex litigation concerning claims and defenses *unrelated* to the employer's promise and the plans' entitlement to the contributions" (emphasis added) (internal quotation marks omitted)).

This strengthened position gives effect to the protections the MPPAA was designed to provide to plans and beneficiaries. Prior to the enactment of § 515, "collection actions by multiemployer plans often were complicated by issues that had arisen between the employer and the local union but were unrelated to the employer's obligation to the plan." *Id.* "Injecting these tangential issues into collection actions consumed plan resources by increasing the cost and delay involved in litigation" and, should an employer's defense be successful, resulted in decreased plan contributions. *Id.*

Permitting a plan to bring an action against an individual employer in accordance with the plain language of the plan documents or CBA addresses these issues in three crucial ways. First, it streamlines the collections process and ensures plans remain funded pursuant to the plan's clear terms. *Id.* at 1021–22. Second, it permits plans to apply the written terms of plan participation uniformly, despite the existence of numerous individual CBAs—all with their own unique provisions—through which employers agreed to contribute to the plan. *Cf. Sinai Hosp. of Balt., Inc. v. Nat'l Benefit Fund for Hosp. & Health Care Emps.*, 697 F.2d 562, 568 (4th Cir. 1982) (binding a multiemployer pension plan to all the terms of an individual CBA would "completely dissipate the law of trusts, leaving employee benefit funds vulnerable to the recurring whims of employer/union bargainers"). Third, it leaves for separate litigation any matters between the employer and the union arising from their individual CBA, to which the plan was not a party. This last point is particularly important given that plans necessarily do not have the same duties and interests as local labor unions or employers. *See Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transport, Inc.*, 472 U.S. 559, 576 (1985) (noting that where a plan's "duty

8

extends to all [national] participants and beneficiaries of [the] multiemployer plan," "a local union's duty is confined to current employees employed in the bargaining unit in which it has representational rights").

This Court has underscored the need for plans to be able to enforce their trust agreements uniformly. In *Ralph's Grocery*, we concluded that where two CBA provisions conflict, the provision imposing "uniform [plan] participation requirements" governs. 118 F.3d at 1025. There, an employer had entered into a CBA requiring it to contribute to a multiemployer pension plan. One of the specific CBA provisions plainly provided that the employer would not be required to make any plan contributions based on severance pay. However, the applicable plan (a multiemployer plan) also required as a condition of participation that the CBA include a separate clause—known as a "standard clause"— providing that the employer would agree to make plan contributions based on rates established by the plan trust, and that the standard clause encompassed "the sole and total agreement between the [e]mployer and [u]nion with respect to pensions or retirement." *Id.* at 1022. In turn, the plan later enacted a provision requiring employers to make contributions based on severance pay. But when the employer began reducing its workforce and disbursing severance pay, it did not make plan contributions in accord with the standard clause. Instead, relying on the other CBA provision relieving it from a severance payment obligation, the employer declined to make a contribution. The fund filed suit, demanding delinquent contributions based on the severance pay.

In resolving the conflict between these provisions, the Court recognized as an initial matter that the purpose of § 515 was to "permit multiemployer funds to rely on the

9

representations made to it" by employers, including agreement to any uniform participation requirements. *Id.* at 1025. The Court then interpreted the competing provisions in accordance with that purpose and held that the standard clause controlled. Accordingly, the employer was required to make the contributions in accordance with the terms set by the trust—and thereby based on severance pay. First, the Court recognized that "by virtue of section 515," the fund was entitled to rely on the "literal meaning of the [c]ompany's representation" in the standard clause—that is, that the "the standard clause was the parties' complete agreement on pensions," rendering the other clause's exclusion of contributions based on severance pay "ineffective against the [plan]." *Id.* at 1023–24. Otherwise, the plan would be "required to comb through the other parts of the [CBA] searching for additional terms related to pensions," which would require plan counsel to inspect all individual CBA provisions and exacerbate the "risk of losing contributions due to overlooked or misinterpreted provisions that appear outside the standard clause and purport to alter the uniform standard of participation." *Id.* at 1024. Second, because the plan's "acceptance of an employer [was] based on the terms of the prescribed instruments," "the terms of the standard clause [necessarily] form[ed] the basis for the [employer's] relationship with the [plan]." *Id.* And third, allowing the plan to rely on the standard clause was "consistent with the congressional policies embodied in section 515," particularly the need to "reduce the cost of administering funds" and "achieve a uniform standard of participation for all participating employers." *Id.* Thus, where two provisions concerning plan contribution conflict, that which gives effect to the purposes of § 515 prevails. *See id.* at 1025.

10

II.[3]

Having established these background principles, we turn to the facts at hand. Four-C-Aire is a New York-based corporation that employs members of the Sheet Metal Workers International Association Local Union No. 58. Throughout labor negotiations with Local Union No. 58, Four-C-Aire utilized a national trade association to represent it. At the conclusion of negotiations, Four-C-Aire signed onto an existing CBA[4] that incorporated other documents, none of which the corporation had played a part in drafting. Specifically, the negotiations resulted in Four-C-Aire becoming a signatory to a CBA that was to remain in effect, per a durational clause[5] in the CBA, until April 30, 2016. In turn,

---

[3] The facts are principally drawn from the complaint's allegations—along with any reasonable inferences from them—which must be viewed as true at this stage of the proceedings. *See Nemet Chevrolet, Ltd. v. Consummeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). Because the complaint quoted and incorporated by reference other documents on which the claim is grounded, we can consider them also. *See Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 197 (4th Cir. 2009).

[4] In so doing, Four-C-Aire entered into a "me-too agreement," which is a contract where an employer agrees to be bound by the terms of a CBA negotiated by a multiemployer association and local union. *Carpenters Health v. Mgmt. Res. Sys. Inc.*, 837 F.3d 378, 382–83 (3d Cir. 2016). Such agreements permit employers to benefit from the terms of an association's CBA without having to participate in the collective bargaining process. *Id.*; *see also Ariz. Laborers, Teamsters & Cement Masons Local 395 Health & Welfare Trust Fund v. Conquer Cartage Co.*, 753 F.2d 1512, 1518 (9th Cir. 1985) (noting that me-too agreements permit independent employers "to obtain all the benefits of the master [CBA] that is negotiated by the principal employers in the industry"—including "whatever protections or advantages the industry [CBA] provides other employers"— "without having to participate in the industry negotiations, or to engage in separate negotiations, every few years").

[5] *See M & G Polymers*, 135 S. Ct. at 934 (noting a durational clause indicates the "set time" at which a contract or provision will expire).

11

the CBA required Four-C-Aire to contribute to the Fund[6] and "incorporated by reference" the Fund's Trust Documents.[7] The CBA also bound Four-C-Aire to abide by the terms and conditions of the Trust Documents, "including any amendments thereto and policies and procedures adopted by the [Fund's] Board[] of Trustees."[8] J.A. 10, 112–13. Specifically, the text of the CBA provided:

> The parties agree to [be] bound by . . . the separate agreements and declarations of trusts of all other local or national programs to which it has been agreed that contributions will be made. In addition, the parties agree to be bound by any amendments to said trust agreements as may be made from time to time[.]

*Bd. of Trustees, Sheet Metal Workers Nat'l Pension Fund v. Four-C-Aire, Inc.*, No. 1:16-cv-1613, 2017 WL 1479425, at *10 n.8. (E.D. Va. Apr. 21, 2017).

In turn, under Article V, Section 6(a) of the Trust Documents, Four-C-Aire was required to pay an exit contribution to the Fund when three criteria were met: (1) it ceased to have an obligation to contribute to the Fund, and (2) as a result of the cessation of its obligation to contribute, it had an event of withdrawal under Title IV of ERISA, but (3) did

---

[6] The Fund operates a multiemployer pension plan as defined under ERISA, as amended by the MPPAA, and created and maintained under § 302(c) of the Labor Management Relations Act of 1947.

[7] Neither the CBA nor the Trust Document are in the record on appeal. Thus, we rely on the description and quotation of these documents set forth in the complaint and district court opinion, which the parties do not contest. *See Feminist Majority Found. v. Hurley*, 911 F.3d 674, 697 (4th Cir. 2018); *Matrix Capital Mgmt. Fund*, 576 F.3d at 197.

[8] The Fund is administered by a plan sponsor, its Board of Trustees. *See* 29 U.S.C. §§ 1002(16)(B)(iii), 1301(a)(10) (providing that a multiemployer pension plan's sponsor is either the joint board of trustees or an administrator). As a fiduciary of the Fund, the Board is permitted to bring a § 515 action on the Fund's behalf. *See* 29 U.S.C. §§ 1132(a)(3), 1132(g)(2). Our references to the "Fund" include the Board in this capacity.

not have to pay a statutorily-mandated withdrawal liability.[9] While the CBA was in effect, the Trust Documents were amended to state:

> [B]y agreeing to contribute, continuing to contribute, or continuing to be obligated to contribute, to the Fund, each Employer agrees to pay an Exit

[9] Under the MPPAA, an employer owes "a fixed and certain debt to the pension plan"—known as withdrawal liability—when it makes a complete or partial withdrawal from the plan. *Pension Benefit Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 725 (1984) (citing 29 U.S.C. §§ 1381, 1391). "The purpose of assessing withdrawal liability is to assign to the withdrawing employer a portion of the plan's unfunded obligations in rough proportion to that employer's relative participation in the plan" such that the plan may remain solvent even upon an employer's withdrawal. *Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc.,* 791 F.3d 436, 440 (4th Cir. 2015) (internal quotation marks omitted); *see also Concrete Pipe,* 508 U.S. at 610. The amount of an employer's withdrawal liability depends on its share of the "plan's unfunded vested benefits," which is "calculated as the difference between the present value of vested benefits and the current value of the plan's assets." *Pension Ben. Guar. Corp.,* 467 U.S. at 725 (internal quotation marks omitted); *see* 29 U.S.C. §§ 1381, 1391.

As relevant to Four-C-Aire, a complete withdrawal occurs when: (1) "an employer ceases to have an obligation to contribute under the plan," such as through the expiration of the CBA, and (2) the employer "continues to perform work in the jurisdiction of the [CBA] of the type for which contributions were previously required." 29 U.S.C. § 1383(b)(2). When, on May 1, 2016, Four-C-Aire continued to operate in the jurisdiction covered by the CBA and yet no longer had an obligation to contribute to the Fund because of the expiration of the CBA—events discussed further below—it ordinarily would have had to pay the statutorily-mandated withdrawal liability.

But Four-C-Aire "was not required to pay statutory withdrawal liability under ERISA's *de minimis* rule," which is intended to eliminate or reduce the withdrawal liability certain employers—generally smaller companies—would owe, to the extent that their calculated withdrawal liability is less than $150,000. Opening Br. 7 (citing 29 U.S.C. §§ 1381(b)(1)(A), 1389).

Rather, the Trust Documents provided that the Fund would instead assess a specific exit contribution based upon its own formula in the plan. Specifically, the Documents provided that the amount an employer would owe as an exit contribution upon an event of withdrawal would be equal "to the amount of the employer's contributions due for the 36-month period preceding the month in which the employer ceased to have an obligation to contribute." J.A. 15 ¶ 41; *see also* 29 U.S.C. § 1391(c)(1) (providing a plan may determine, with certain restrictions, its own method of assessing a contribution upon withdrawal). At this point in the proceedings, the exact amount of the corporation's exit contribution is not an issue before us.

13

Contribution in accordance with this [provision]. *The Employer's obligation to pay an Exit Contribution under this [provision] is independent of the Employer's [CBA] and continues to apply after the termination of the [CBA] (notwithstanding any language to the contrary in the [CBA]).*

J.A. 16 (emphasis in original) (the "Amendment").

Four-C-Aire's obligation to contribute to the Fund in the ordinary course ended on or around April 30, 2016, when the terms of the CBA expired and Four-C-Aire had not entered into a new CBA or other agreement requiring it to contribute to the Fund.[10] Several months later, in August 2016, the Fund notified Four-C-Aire that the corporation had "an event of withdrawal under Title IV of ERISA" on or around May 1, 2016 when the CBA expired without Four-C-Aire having entered into a new agreement requiring contributions to the Fund yet it continued to operate in the jurisdiction covered by the CBA. J.A. 17. The Fund demanded an exit contribution of $97,601.01, which it claimed to be the amount required by the Trust Documents based on Four-C-Aire's contribution history. J.A. 17. Four-C-Aire refused.

The Fund then filed a complaint, subsequently amended, in the United States District Court for the Eastern District of Virginia, alleging that the corporation owed an exit contribution to the Fund as a delinquent contribution under §§ 502 and 515 of ERISA

---

[10] As discussed further below, the CBA also contained an "evergreen clause." Such clauses extend the CBA's terms or particular portions for successive periods even after the specified expiration date until certain conditions are met. Here, the evergreen clause noted that the CBA would remain in full force and effect until April 30, 2016 and "from year to year thereafter unless written notice of reopening" was given "not less than ninety (90) days prior to the expiration date." J.A. 113 (internal quotation marks omitted). Four-C-Aire provided such notice and thus ceased having an obligation to contribute in the ordinary course upon the CBA's expiration.

14

(codified at 29 U.S.C. §§ 1132 and 1145). Four-C-Aire moved to dismiss the Fund's claim, arguing that its obligations under the CBA—including any duty to pay an exit contribution as required under the Trust Documents, regardless of the Amendment—had ceased when the CBA expired.[11]

The district court granted Four-C-Aire's motion to dismiss the Fund's claim, relying on three independent grounds: first, it determined the duty to pay an exit contribution did not survive the CBA's expiration because the CBA did not specifically state that obligation would survive. The court therefore concluded that the corporation was not bound after the expiration of the CBA by any requirements in the Trust Documents, including the requirement to pay an exit contribution. Second, the district court relied on an alternative ground—not advanced by Four-C-Aire's motion to dismiss—that the complaint's allegations were insufficient to demonstrate that the Amendment had been properly incorporated into the Trust Documents. Specifically, it determined that without allegations (1) that Four-C-Aire knew and consented to the Amendment, and (2) that described the amendment process and that the process had been followed, the Amendment could not be applied against the corporation. Third—and as another alternative ground that Four-C-Aire had not advanced—the district court held that the CBA's grant of "unilateral" modification power to the Fund was illusory and therefore unenforceable under ordinary principles of contract law. *Four-C-Aire*, 2017 WL 1479425, at *10.

---

[11] The Fund and additional plaintiffs also asserted a claim for delinquent contributions for a specific period when the CBA was still in effect. That separate claim and the additional plaintiffs are not part of this appeal.

The Fund noted a timely appeal and the Court has jurisdiction under 28 U.S.C. § 1291.[12]

## III.

The Court reviews de novo the district court's decision to grant a motion to dismiss under Rule 12(b)(6). *Owens v. Balt. City State's Attorneys Office*, 767 F.3d 379, 388 (4th Cir. 2014). To survive a motion to dismiss the Fund's claim that Four-C-Aire owed an exit contribution, the complaint was required to "state a claim to relief that is plausible on its face," meaning that it had to "plead[] factual content that allows the court to draw the reasonable inference that [Four-C-Aire] is liable" to pay such a contribution under the terms of its agreement. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). When assessing the complaint's plausibility, the Court must "assume as true all its well-pleaded facts and draw all reasonable inferences in favor of the plaintiff." *Nanni v. Aberdeen Marketplace, Inc.*, 878 F.3d 447, 452 (4th Cir. 2017).

The Fund contends that none of the district court's grounds for dismissing its claim for an exit contribution withstand review. Pointing to principles of ERISA that govern multiemployer pension plans as well as general contract principles, the Fund asserts that the district court misinterpreted the plain language of the CBA and Trust Documents. In

---

[12] During the appeal, the Court identified a possible jurisdictional defect related to a settlement agreement and ordered supplemental briefing. Based on the parties' written and oral submissions to the Court clarifying the nature of the settlement agreement and related actions, we are satisfied that we have jurisdiction based on the entry of a final, appealable order.

addition, it argues the complaint's allegation that the Trust Documents "were amended" requires the inference that those documents were properly amended and that any challenge to the amendment process should be raised as a defense to liability later in the proceedings. Lastly, the Fund argues the district court misunderstood how multiemployer pension plans work when it held that Four-C-Aire's liability was premised on an illusory promise and was unenforceable. For the reasons set forth below, we agree with the Fund on each of these points and conclude it has adequately alleged a claim for an exit contribution against Four-C-Aire.

A.

The district court's first ground for dismissing the Fund's claim was its conclusion that the language in the CBA incorporating the Trust Documents did not survive the CBA's expiration, so any of Four-C-Aire's duties under the Trust Documents likewise did not survive. In order to fully understand the district court's errors in reaching this conclusion, we first provide a lengthier explanation of its reasoning.

At the outset, the district court held "that exit contribution requirements imposed by an incorporated trust document do not survive the termination of the CBA *unless explicitly noted in the CBA*." *Four-C-Aire*, 2017 WL 1479425, at *10 (emphasis added). The court's analysis on this point was truncated because it relied on its own prior holding to this effect in a case involving a different former participating employer but a similarly worded CBA and the same multiemployer pension plan (the Fund). *See id.*; *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Caddo Sheet Metal, LLC*, No. 1:14–cv–858, 2015 WL 4032037 (E.D. Va. June 30, 2015). In *Caddo Sheet Metal*, the district court held that when

17

a CBA contained an evergreen clause specifically stating which provisions survive the expiration of the CBA, and the provision incorporating the Trust Documents was not listed in that clause, the incorporation provision—and therefore any duties contained only in the Trust Documents—did not survive the CBA's expiration. 2015 WL 4032037, at *3. That reasoning led the district court in *Caddo Sheet Metal* to hold that the Fund was not entitled to seek an exit obligation from a former participating employer after its CBA expired. *Id.* at *6.[13]

In dismissing the Fund's claim against Four-C-Aire, the district court adopted its reasoning in *Caddo Sheet Metal* as the basis for concluding the Fund had not stated a claim for an exit contribution based on the pre-Amendment Trust Documents. In short, like the CBA at issue in *Caddo Sheet Metal*, the CBA in the case at bar had (1) a durational clause specifically stating when the CBA ended and Four-C-Aire's obligation to contribute to the Fund ceased (April 30, 2016) and (2) an evergreen clause stating that certain parts of the CBA would remain in force after that time under certain conditions—but the CBA's provision incorporating the Trust Documents was not listed as a provision that survived the CBA's expiration.[14] Therefore, the district court concluded, as in *Caddo Sheet Metal*,

---

[13] The district court's decision in *Caddo Sheet Metal* was not appealed, so it is not directly before us. Nonetheless, we reject the *reasoning* of that decision to the extent the district court relied on it to decide the Fund's claim against Four-C-Aire.

[14] The district court quoted the evergreen clause as providing:

> This Agreement and Addenda Numbers one (1) through thirty-two (32) attached hereto shall become effective on the 1st day of May, 2011 and remain in full force and effect until the 30th day of April 2016 and shall continue in force from year to year thereafter unless written notice of

18

that any obligations set out in the Trust Documents—including the duty to pay the exit contribution—did not survive the CBA's expiration.

The district court then observed that the Amendment was the only changed circumstance from *Caddo Sheet Metal*, but concluded that the Amendment did not lead to a different result. It noted that both *Caddo Sheet Metal* and *M & G Polymers* had focused "on the bargaining agreement and not on the secondary documents," i.e., the Trust Documents, when analyzing the extent of the employer's obligations. *Four-C-Aire*, 2017 WL 1479425, at *11. Consequently, the court concluded that any changes to the Trust Documents did not alter the barrier it had identified in *Caddo Sheet Metal*, which was that the CBA did not specifically provide that the incorporation clause (and therefore any duties set out in the Trust Documents) would survive the CBA's expiration. Relying on *Caddo Sheet Metal*, the district court held that Four-C-Aire's agreement to pay an exit contribution did not survive the CBA's expiration. However, in the course of its reasoning, the district court never considered the impact of § 515.

The district court's reasoning thus runs counter in at least two respects to Four-C-Aire's alleged contractual obligations. First, under § 515, the CBA and Trust Documents

reopening is given not less than ninety (90) days prior to the expiration date. In the event such notice of reopening is served, this Agreement shall continue in force and effect until conferences relating thereto have been terminated by either party by written notice, provided, however, that, if this Agreement contains [an arbitration provision], it shall continue in full force and effect until modified by order of the National Joint Adjustment Board or until the procedures under [the arbitration provision] have otherwise been completed.

*Four-C-Aire*, 2017 WL 1479425, at *7 (emphasis omitted).

must be interpreted so that Four-C-Aire is held to the requirements set forth by the plain language of those Documents—and as adequately alleged in the complaint, these requirements included payment of an exit contribution after the expiration of the CBA. Second, even if § 515 did not produce such a result, ordinary contract principles regarding the incorporation of documents would similarly compel the finding that the Fund has adequately alleged that Four-C-Aire was liable for an exit contribution. We address each in turn.

B.

1.

"According to section 515, the scope of [an employer's] obligation to [a plan] is controlled by the plan documents and the representations that appear in the [CBA]." *Ralph's Grocery*, 118 F.3d at 1023. Thus, under § 515, "a multiemployer plan can enforce, as written, the contribution requirements found in the controlling documents," even if an employer might have an otherwise valid common law defense against contribution. *Id.* at 1021. Such controlling documents must be interpreted "in accordance with the principles embodied in section 515." *Id.* at 1023. And here, the plain language of the contribution requirements as set forth in those documents provided that Four-C-Aire was obligated to pay an exit contribution[15] even after the expiration of the CBA. In sum, because (1) Four-

---

[15] The district court noted that the parties disputed whether an exit contribution in this case even qualified as a "contribution" under ERISA §§ 502 and 515. The district court determined that because the Amendment "is unenforceable against Four-C-Aire," it did not need to reach that question. *Four-C-Aire*, 2017 WL 1479425, at *8 n.4.

20

C-Aire signed the CBA and thereby agreed to be bound by the Trust Documents, (2) the Trust Documents provided that a participating employer would be obligated to pay an exit contribution under certain circumstances, (3) the Amendment *additionally* stated that the obligation would survive the expiration of the CBA, and (4) the complaint alleged that Four-C-Aire failed to pay the exit contribution despite the occurrence of events requiring such a contribution, the Fund has set forth a viable claim for an exit contribution from Four-C-Aire.

First, the controlling documents determining the extent of Four-C-Aire's obligations to the Fund included both (1) the CBA and (2) the Trust Documents (as well as any amendments to the Trust Documents). Specifically, the complaint alleged that when Four-C-Aire signed onto the CBA, it agreed to "abide by the terms and conditions of" the Trust Documents and "expressly incorporated" the Trust Documents. J.A. 10 ¶ 11. Furthermore, as set forth in the complaint, the text of the CBA stated: "The parties agree to [be] bound by . . . the separate agreements and declarations of trusts of all other local or national programs to which it has been agreed that contributions will be made." *Four-C-Aire*, 2017

---

We conclude that the exit contribution in this case constituted a "contribution" under § 515 of ERISA. We have previously held that "[a]n action to compel an employer to pay overdue withdrawal liability is treated the same as an action to collect delinquent contributions." *Plumbing Servs.,* 791 F.3d at 445 (finding that the district court had jurisdiction under ERISA § 515 to hear a claim compelling an employer to pay withdrawal liability because "an employer that is contractually obligated to make contributions to a retirement fund must do so in accordance with the operative [CBA]" (citing 29 U.S.C. § 1145)). Given our prior explanation that exit contributions operate as a subset of withdrawal liability payments, *see supra* n. 9, it follows that exit contributions also constitute a contribution under ERISA § 515. Furthermore, the Trust Documents provided that an employer's failure to pay an exit contribution would be treated as a delinquent contribution.

21

WL 1479425, at *10 n.8. "In addition," the CBA continued, "the parties agree to be bound by any amendments to said trust agreements as may be made from time to time[.]" *Id.* Thus, Four-C-Aire clearly agreed by signing the CBA to abide by the contribution requirements set forth in the Trust Documents and any amendments to those Documents. Accordingly, in examining the controlling documents at issue in this § 515 action, we may look to both the CBA and the Trust Documents to determine the extent of Four-C-Aire's obligations. This conclusion is bolstered by the text of § 515, which provides that employers may be obligated to make plan contributions "under the terms of the plan *or* under the terms of the [CBA]." 29 U.S.C. § 1145 (emphasis added); *see also Ralph's Grocery*, 118 F.3d at 1023 ("According to section 515, the scope of [an employer's] obligation to [a plan] is controlled by the plan documents *and* the representations that appear in the [CBA]." (emphasis added)).

Second, Article V, Section 6(a) of the Trust Documents required that Four-C-Aire pay an exit contribution if three criteria were met: (1) it ceased to have an obligation to contribute to the Fund, and (2) as a result of the cessation of its obligation to contribute, it had an event of withdrawal under Title IV of ERISA, but (3) did not have to pay a statutorily-mandated withdrawal liability. Put another way, the pre-Amendment Trust Documents provided that Four-C-Aire would pay an exit contribution to the Fund "after the expiration of its [CBA] if it ceased to have an obligation to contribute to the Fund as a result of such expiration, and it did not enter into a successor [CBA] requiring contributions to the Fund." J.A. 15 ¶ 40. Thus, according to the well-pleaded allegations in the complaint, the plain terms of the Trust Documents required Four-C-Aire to pay an exit contribution

22

upon the expiration of the CBA (if no successor CBA had been reached), even prior to the Amendment.

The complaint further alleged that all the events triggering an exit contribution occurred as to Four-C-Aire: that is, the corporation ceased having an obligation to contribute to the Fund because of the CBA's expiration; this cessation resulted in an event of withdrawal; but Four-C-Aire did not have to pay the statutory withdrawal liability because of ERISA's *de minimis* rule. Altogether, this is sufficient to allege that Four-C-Aire's duty to pay an exit contribution survived the CBA's expiration, even if the triggering event was the CBA's expiration.[16]

Third, regardless of whether the original Trust Documents created a duty to pay that survived the CBA's expiration (they did), the Trust Documents were *also* explicitly amended to provide that the exit contribution requirement would survive the CBA's expiration.[17] Contrary to the district court's analysis, the complaint's allegations concerning the Amendment further support the Fund's claim against Four-C-Aire. In

---

[16] This conclusion is bolstered by the connection between the exit contribution and withdrawal liability obligation. The complaint provides that when an exit contribution arises (upon an event of withdrawal under Title IV of ERISA), that exit contribution is required only if an employer is not statutorily mandated to pay a withdrawal liability. *See* J.A. 15 ¶ 39. It is clear that the exit contribution is meant to bridge—via contract—a gap in payments to the Fund created when a participating employer would be obligated by statute to pay withdrawal liability, but is relieved of that withdrawal obligation by ERISA's *de minimis* rule.

[17] We note this analysis even though we conclude that the terms of the CBA and pre-Amendment Trust Documents—at least as alleged and apparent from the record before us—would be sufficient to survive dismissal, and that the complaint's allegations regarding the Amendment may not be necessary to show that Four-C-Aire's obligation to pay an exit contribution survived the expiration of the CBA.

particular, the complaint alleges that the CBA's language incorporating the Trust Documents specifically indicated that Four-C-Aire would be bound by not only the provisions of the Trust Documents in effect at the time it became a participating employer, but also "any amendments thereto and policies and procedures adopted by the" Trustees, which were also "expressly incorporated" into the CBA. J.A. 10 ¶ 11. The complaint further alleges that the Trust Documents were amended to include the following language: "[a participating employer's] obligation to pay an Exit Contribution under this Section 6 is independent of the Employer's [CBA] and continues to apply after the termination of the [CBA] (notwithstanding any language to the contrary in the [CBA])." J.A. 16 ¶ 44 (emphasis omitted). These terms plainly establish that regardless of any language in the CBA or the expiration of the CBA, a contributing employer's obligation to pay an exit contribution would survive its expiration. Thus, when the events triggering an exit contribution payment were fulfilled, Four-C-Aire was required to pay an exit contribution regardless of the underlying CBA's status.

Consequently, the only remaining question for purposes of the motion to dismiss is whether the complaint sufficiently alleged a violation of the obligation to pay an exit contribution. In short, it did. Specifically, the complaint alleged Four-C-Aire did not pay an exit contribution despite the Trust Documents' conditions being satisfied as a result of the CBA's expiration. These allegations are sufficient to state a claim for relief under § 515 of ERISA. *See* 29 U.S.C. §§ 1145, 1132(g)(2).

Contrary to the district court's reasoning, this is the case even though the survival of the incorporation provision—and thereby the exit contribution obligation—was not

24

specified in the evergreen clause. A CBA can explicitly provide that certain obligations contained within it may extend beyond the CBA's expiration—as the district court correctly recognized in *Caddo*. 2017 WL 4032037, at *2. And that is exactly what occurred here: the Trust Documents, which were expressly incorporated into the CBA, unambiguously provided that an employer's obligation to pay the exit contribution survived the expiration of the CBA.[18]

Furthermore, in attempting to distinguish between the terms of the CBA and the terms in the "secondary documents," the district court ignored ERISA § 515, which explicitly provides that a plan may bring an action against any employer "obligated to make contributions to a multiemployer plan *under the terms of the plan or under the terms of a [CBA]*." 29 U.S.C. § 1145 (emphasis added). Section 515 does not distinguish between primary and secondary documents in the enforcement of delinquent contributions, instead providing that "such contributions [shall be made] in accordance with terms and conditions of such plan or such agreement." *Id.*; *see also Ralph's Grocery*, 118 F.3d at 1023 ("According to section 515, the scope of [an employer's] obligation to [a plan] is controlled

---

[18] To the extent that Four-C-Aire argues that *M & G Polymers* mandates the opposite result, that case is inapposite. There, the Supreme Court considered the written contractual terms against arguments about what *inferences* could be drawn from that language, ultimately holding that the written language controlled. 135 S. Ct. at 933. It did not involve—like the case here—a conflict between language in primary and incorporated documents, nor did it address how to reconcile such language. In this sense, *M & G Polymers* shows the error of the district court in failing to give due weight to *all* the written contractual commitments of Four-C-Aire as found in the CBA and incorporated Trust Documents.

Finally, to the extent *M & G Polymers* is applicable, the Supreme Court there recognized that the parties to a CBA could explicitly agree to extend specific obligations beyond the CBA's expiration. *Id.* at 937.

25

*by the plan documents and the representations that appear in the [CBA].*" (emphasis added)). And here, where the contribution requirements found in the controlling documents plainly provided that Four-C-Aire was obligated to pay an exit contribution, the failure to specify the survival of the exit contribution obligation in the evergreen clause does not require the Court to eschew the plain language of the controlling documents.

In sum, as alleged in the complaint, Four-C-Aire agreed to be bound by both the CBA and the Trust Documents. Thus, the terms of the Trust Documents had to be considered to determine whether any specific obligations survived the CBA's expiration. Because the district court's analysis failed to look to the plain language of the Trust Documents and instead centered exclusively on whether the CBA called for the incorporation provision to survive the CBA's expiration, the court's analysis was in error.[19]

---

[19] But even if § 515 had not required that Four-C-Aire pay the exit contribution, the district court's reasoning runs counter to common law principles governing contract interpretation. First, as set forth in the complaint, the CBA incorporated the Trust Documents and stated that Four-C-Aire agreed to be bound by both instruments. This means that both documents were relevant to determining what contractual duties survived the expiration of the CBA. *World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co.*, 783 F.3d 507, 519 n.6 (4th Cir. 2015) ("[W]here a contract expressly refers to and incorporates another instrument in specific terms which show a clear intent to incorporate that instrument into the contract, both instruments are to be construed together." (internal quotation marks omitted)). Second, the plain language of the pre-Amendment Trust Documents provided that Four-C-Aire would owe an exit contribution when it ceased to have an obligation to contribute to the Fund even if the event that triggered that requirement was the CBA's expiration. Third, the Amendment—which must also be considered in determining the corporation's contractual duties—only strengthens the conclusion that the obligation to pay an exit contribution survived the CBA's expiration. And fourth, the complaint sufficiently alleged a violation of this contractual duty to pay an exit contribution to survive a motion to dismiss. An analysis of the provisions at issue under contract principles only highlights the errors in the district court's reasoning. *See M & G Polymers*, 135 S. Ct. at 933 ("[T]he rule that contractual provisions ordinarily should be enforced as

26

2.

*Ralph's Grocery*—which the district court entirely ignored in its analysis—further underscores the error in the district court's reasoning. As discussed above, this Court has emphasized the need to provide for uniform enforcement of trust agreements by holding that where various trust and CBA terms conflict, § 515—as a statement of federal labor policy—mandates that the terms of the provision permitting for uniform enforcement of the trust documents govern.

In contrast to *Ralph's Grocery*, the provisions at issue in this case were not in conflict: had the Fund searched for a potentially conflicting clause undermining the mandate of the Trust Documents and the Amendment, it would have found none. The terms of the CBA clearly incorporated all Trust Documents, and the Trust Documents plainly provided that an exit contribution was required under certain circumstances—an obligation which survived the expiration of the CBA. The only potential conflict, as asserted by Four-C-Aire, was the evergreen clause's failure to include the incorporation provision. But for all of the reasons discussed above, the Fund was entitled to rely on and enforce the plain terms of the Trust Documents, including the Amendment.

Furthermore, even if the evergreen clause or another provision in the CBA plainly conflicted with the exit contribution requirement, the latter would prevail. First, "by virtue of section 515," the Fund was entitled to "rely on and enforce the literal meaning of [Four-C-Aire's] representation" that it would agree to abide by the terms of the Trust Documents

---

written is especially appropriate when enforcing an ERISA [welfare benefits] plan." (second alteration in original) (internal quotation marks omitted)).

27

and any amendments thereto. *Ralph's Grocery*, 118 F.3d at 1023–24. Second, the Trust Documents and Amendment controlled because Four-C-Aire's acceptance of the terms set forth in those documents, as provided in the CBA, "form[ed] the basis for [its] relationship with the Fund." *Id.* at 1024. And finally, as discussed below, congressional policy provides that multiemployer pension plans like the Fund are entitled to enforce the terms of their plans uniformly.

3.

We conclude by noting that the district court's analysis would also undermine the statutory protections Congress set in place for multiemployer pension plans. In providing a cause of action permitting plans to enforce contribution requirements according to the plain terms of the controlling documents, Congress created a statutory scheme that would allow plans to enforce their contribution obligations uniformly and thereby avoid discrepancies in the enforcement of such obligations. But that is precisely what the district court's holding permits: if the unique evergreen clause in Four-C-Aire's individual CBA indeed dictated the extent of its obligations to the Fund, the Fund would be prevented from uniformly enforcing exit contribution requirements because other withdrawing employers would be able to point to similar individual CBA terms to limit their particular obligations to the Fund. Instead, by enforcing the terms of the Trust Documents and Amendment according to their plain language, the Fund is able to ensure uniform application of the exit contribution requirements.

This also streamlines the collections process and ensures the Fund remains solvent based on the application of that plain language. Because the Fund provides mechanisms

28

that spread the risks and costs of running a benefits plan amongst multiple employers, the cost of Four-C-Aire's withdrawal *without* the guarantee of exit contributions or withdrawal liability would be shouldered to a far greater extent by the remaining employers (as well as the employees)—a result § 515 was designed to avoid.

Finally, if the Fund were not able to bring such a suit under § 515, it would have instead been forced to rely on litigation between the employer and union to enforce the contribution requirement—which, as discussed above, would have more likely than not resulted in delayed or reduced contributions. Furthermore, the Fund's interest in avoiding such litigation is particularly important given that it does not have the same duties and interests as Local Union No. 58. *Id.* at 1021–22. For all of these reasons, the district court's analysis erroneously ignored the statutorily mandated protections afforded to multiemployer pension plans.

\* \* \* \*

The district court thus erred in concluding the incorporation of the Trust Documents did not survive the termination of the CBA as a basis to grant Four-C-Aire's motion to dismiss. And for the reasons discussed above, the allegations of the complaint are sufficient to state a claim for relief under § 515 of ERISA. 29 U.S.C. § 1145.

IV.

The district court also articulated two alternative grounds for dismissing the Fund's claim for an exit contribution, which were based solely on its holding that the Fund could not bring its claim under the language of the Amendment. The first ground was that the

29

complaint contained insufficient allegations to demonstrate that the Amendment had been "properly incorporated into the CBA." *Four-C-Aire*, 2017 WL 1479425, at \*11. The second was that the CBA's language purporting to give the Fund unfettered unilateral modification power over the Trust Documents was "illusory" and therefore unenforceable, making the Amendment also unenforceable. *Id.* at \*11–\*12. The district court was wrong on both grounds.

The district court erred in dismissing the Fund's claim based on perceived flaws in the Trust Documents' amendment process. Specifically, the court held that applying an amendment that had been added without Four-C-Aire's "knowledge, awareness, or consent[] would result in surprise and hardship." *Id.* at \*11. It then noted that because the complaint lacked any allegations that Four-C-Aire had the opportunity "to acknowledge and assent to" the Amendment "or was even aware of this Amendment," the corporation could not be bound by the Amendment. *Id.* Further, the district court observed that the Complaint did not allege "who amended the document or how it was amended," or whether the Fund "had any specific process for amending" the Trust Documents. *Id.*

At the motion to dismiss stage, the court should not have considered the viability of a potential defense against enforcement of the Amendment due to an invalidity in its adoption; such a consideration requires factual development that is not before the court when considering a motion to dismiss. When considering the sufficiency of a complaint's allegations under a Rule 12(b)(6) motion, courts must construe the complaint "liberally so as to do substantial justice." *Hall v. DIRECTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017) (internal quotation marks omitted). In turn, the complaint need only "give the defendant

30

fair notice of what the claim is and the grounds on which it rests" by "stat[ing] a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted). Plaintiffs are not ordinarily required to plead allegations relevant to potential affirmative defenses to an asserted claim. *See Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc) (noting that "[i]n the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss," but that this principle only applies "if all facts necessary to the affirmative defense clearly appear[] on the face of the complaint" (second alteration in original) (emphasis and internal quotation marks omitted)). But by considering the viability of potential defenses, the district court here failed to view the complaint's allegations— including all reasonable inferences—in the Fund's favor as the non-moving party.

The Fund's complaint states that the Trust Documents were "amended," J.A. 16 ¶ 44, to add certain language that further supported its claim that Four-C-Aire owed an exit contribution. Under the above-stated principles, these allegations are sufficient to withstand dismissal: they give Four-C-Aire fair notice that the Fund will be relying on the Amendment to support the claim that it owes an exit contribution. Of course, after further factual development, Four-C-Aire is not barred from challenging the validity of the amendment process. However, at the motion to dismiss stage, it is premature and speculative to conclude that *unknowns* about the amendment process render the Amendment unenforceable against Four-C-Aire as a matter of law. *See Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 513 (4th Cir. 2015) (holding that the district court erred in granting a motion to dismiss where the complaint "provide[d] sufficient detail

about [the] claim to show that [the plaintiff] has a more-than-conceivable chance of success on the merits" (second and third alterations in original) (internal quotation marks omitted)).

In addition, the district court erred in determining that the CBA provision incorporating any future amendments to the Trust Documents bestowed a "complete lack of procedural or substantive limits on [the Fund's] unilateral modification power (as pled)," "mean[ing] that the clause itself is illusory." *Four-C-Aire*, 2017 WL 1479425, at \*11. Under the principles governing a motion to dismiss set out above, the Fund wasn't required to allege such limits in order to allege facts plausibly stating a claim for relief. Again, the district court prematurely assumed certain flaws in the amendment process rather than recognizing that any defenses based on those points are beyond the proper scope of review on a motion to dismiss. The complaint alleged that the Amendment is binding on Four-C-Aire and that its language, coupled with the pre-Amendment language in the Trust Documents, shows Four-C-Aire's obligation to pay an exit contribution. Those allegations suffice to state a claim for relief and dismissal based on the assumed errors in the amendment process was therefore in error.

## V.

For the reasons set forth above, we reverse the district court's order granting Four-C-Aire's motion to dismiss, vacate the judgment as to the exit contribution claim, and remand for further proceedings consistent with this opinion.

*REVERSED, VACATED,*
*AND REMANDED*