**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 20-2181**

_____

BOARD OF TRUSTEES, SHEET METAL WORKERS' NATIONAL PENSION FUND,

> Plaintiff − Appellee,

and

BOARD OF TRUSTEES, INTERNATIONAL TRAINING INSTITUTE FOR THE SHEET METAL AND AIR CONDITIONING INDUSTRY; BOARD OF TRUSTEES, NATIONAL ENERGY MANAGEMENT INSTITUTE COMMITTEE; BOARD OF TRUSTEES, NATIONAL STABILIZATION AGREEMENT FOR THE SHEET METAL INDUSTRY TRUST FUND; BOARD OF TRUSTEES, SHEET METAL OCCUPATIONAL HEALTH INSTITUTE TRUST FUND; BOARD OF TRUSTEES, SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION SCHOLARSHIP FUND,

> Plaintiffs,

> v.

FOUR-C-AIRE, INC.,

> Defendant – Appellant.

_____

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Liam O'Grady, Senior District Judge.  (1:16−cv−01613−LO−IDD)

_____

Argued:  January 26, 2022                    Decided:  July 27, 2022

_____

Before NIEMEYER, AGEE, and DIAZ, Circuit Judges.

_____

Affirmed by published opinion.  Judge Diaz wrote the opinion, in which Judge Niemeyer and Judge Agee joined.

_____

**ARGUED:**   Michael E. Avakian, PRAEMIA LAW, PLLC, Reston, Virginia, for Appellant.  Diana Migliaccio Bardes, MOONEY, GREEN, SAINDON, MURPHY & WELCH, PC, Washington, D.C., for Appellee.  **ON BRIEF:**  John R. Mooney, Lauren P. McDermott, MOONEY, GREEN, SAINDON, MURPHY & WELCH, PC, Washington, D.C., for Appellee.

_____

DIAZ, Circuit Judge:

The Board of Trustees of the Sheet Metal Workers' National Pension Fund ("the Fund") seeks to recover a delinquent exit contribution from Four-C-Aire, Inc., a former participating employer, under § 515 of the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. § 1145. The Fund claims Four-C-Aire's obligation arose under a collective-bargaining agreement ("the CBA") between the Sheet Metal Workers' International Association Local Union No. 58 and the Central New York Sheet Metal Contractors Association, a multiemployer bargaining unit. According to the Fund, Four-C-Aire signed on to this preexisting agreement while it was a member of the Contractors Association.

In *Board of Trustees, Sheet Metal Workers' National Pension Fund v. Four-C-Aire, Inc.* ("*Four-C-Aire I*"), we reversed the district court's dismissal of the Fund's claim, allowing the case to proceed to discovery. 929 F.3d 135, 138 (4th Cir. 2019). From there, Four-C-Aire's liability turned on whether it had adopted Local 58's CBA with the Contractors Association.

On cross-motions for summary judgment, the district court held that Four-C-Aire had adopted the agreement and granted judgment to the Fund. Four-C-Aire appeals, arguing (primarily) that the district court erred in holding that (1) the company signed a "me-too" agreement binding it to the CBA; and (2) it adopted the CBA by its conduct.

Because we agree with the district court that Four-C-Aire adopted the agreement by its conduct, we affirm.

3

I.

A.

The Sheet Metal Workers' National Pension Fund is a multiemployer pension plan that provides benefits to thousands of workers nationwide.  Employers participate in the plan by negotiating a collective-bargaining agreement with a union that requires contributing to the Fund or by adopting a preexisting agreement between an employer association and the union.

A trust document governs the Fund.  That document requires a participating employer to pay an exit contribution upon a "Triggering Event."  J.A. 252.  A triggering event occurs if the employer "ceases to have an obligation to contribute to the Fund . . ., but is not required to pay any withdrawal liability under Title IV of ERISA."  *Id.*[1]  In 2015, the Fund's Board of Trustees amended the trust documents to expressly provide that the exit-contribution requirement survives a collective-bargaining agreement's termination.

Here, we consider the agreement between the Sheet Metal Workers' International Association Local Union No. 58 and the Central New York Sheet Metal Contractors Association.  Three documents define the parties' benefits and obligations under the CBA: the Standard Form of Union Agreement, its Addenda, and the Wage and Fringe Benefits

---

[1] Withdrawal liability, which Congress created under the Multiemployer Pension Plan Amendments Act of 1980, is a "mechanism by which an employer that decides to withdraw from a multiemployer pension plan" must pay a sum "intended to cover that employer's share of the unfunded vested benefits in existence at the time of withdrawal." *Borden, Inc. v. Bakery & Confectionery Union & Indus. Int'l Pension*, 974 F.2d 528, 529–30 (4th Cir. 1992).

Sheet summarizing payment obligations for participating employers. Of these documents, only the Wage Sheet contains a signature block.

The CBA requires employers to contribute to the Fund and binds them to the Fund's trust documents. The Standard Form doesn't mention the Fund, but it provides that signatories "agree to be bound by . . . the separate agreements and declarations of trusts of all [] local or national programs to which it has been agreed that contributions will be made." J.A. 122. The same provision binds employers to the trust agreements for those programs. An addendum identifies the Fund as one such program. *See* J.A. 141–42. And the Wage Sheet lists the required contribution rates to the Fund.

For our purposes, the effect of these scattered provisions is straightforward. Any signatory employer to the CBA between the Contractors Association and Local 58 must contribute to the Fund and is bound by the Fund's trust documents. So, after a triggering event, an employer must pay an exit contribution to the Fund—even if its obligations under the agreement have expired.

B.

1.

Four-C-Aire is a small, New York–based sheet-metal contractor. In early 2014, Local 58 representatives visited Four-C-Aire's office and met with Aaron and Barbara Clothier. Aaron Clothier is Four-C-Aire's owner and president, and Barbara Clothier is the company's secretary-treasurer. The Clothiers were interested in the union's benefits package, as Four-C-Aire had none.

5

The Local 58 representatives communicated with the Clothiers over the ensuing weeks, but the parties dispute what the union shared. The Fund asserts the union sent the Clothiers several copies of the full CBA, including the Standard Form, Addenda, and Wage Sheet. They support this contention with declarations from the Local 58 representatives. But Four-C-Aire insists it never saw the CBA during its negotiations with the union.

In May 2014, the Clothiers agreed to join the union. They went to the union hall and signed the Wage Sheet on Four-C-Aire's behalf. The Fund again tells us that the Local 58 representatives gave the Clothiers the full CBA with the Wage Sheet as the signature page, but Four-C-Aire maintains that the Clothiers only ever received the Wage Sheet.

Despite these disputes, several facts are clear from the record. About a week after the Clothiers signed the Wage Sheet, Local 58 representatives met with Four-C-Aire employees to explain union membership and its benefits. The representatives gave everyone a folder containing, among other things, the Wage Sheet, membership applications, and dues-deduction authorization cards. After this meeting, the Clothiers and their employees joined the union.

Four-C-Aire then contributed to the Fund and other fringe-benefit funds under the CBA for nearly two years. It also deducted union dues from its employees and responded to letters demanding late remittance. Sometime during the two-year period, Four-C-Aire

complied with the Fund's payroll audit, which the CBA authorized.  And at least one employee enrolled in Local 58's apprenticeship program.[2]

2.

In November 2015, Four-C-Aire sent Local 58 a letter saying, "At this time we are opting to not renew our contract agreements with [the union].  Please allow this letter to be accepted as a notice of our non-renewal."   J.A. 143.   Local 58's business manager responded that the company's "attempt to terminate the [CBA] between Four-C-Aire, Inc. [] and Local Union No. 58 . . . is invalid and ineffective," citing the CBA's termination clauses.  J.A. 146.  Four-C-Aire replied with a new letter noting its "150 day notice of non-renewal[,] as required" under the CBA.  J.A. 144.  It said, "When our contract expires on April 30, 2016[,] we will not renew.  We have also notified the Central New York Sheet Metal Contractors Association of our decision to withdraw from the Association at the end of our contract."  *Id.*

After the CBA expired, Four-C-Aire's obligation to contribute to the Fund ceased. Yet the company kept performing covered work in the same area, thus satisfying the conditions for an ERISA withdrawal.  *See* 29 U.S.C. § 1383(b)(2).  After determining that ERISA didn't require Four-C-Aire to pay statutory withdrawal liability, the Fund assessed a $97,601.01 exit contribution.

---

[2] Four-C-Aire disputes this fact.   Appellant's Br. at 9.   But the employee's apprenticeship profile is in the record.  Decl. of Diana M. Bardes, Ex. 16, *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, No. 16-cv-1613 (E.D. Va. Apr. 17, 2020), ECF No. 93-16.  And the "Apprentice Start Date" is June 17, 2014—after Four-C-Aire unionized.  *Id.*

Four-C-Aire refused to pay.  The Fund sued under ERISA § 515, which allows multiemployer benefit plans to collect delinquent contributions from employers under the plain terms of their collective-bargaining agreement.  *See id.* § 1145.

## C.

### 1.

On Four-C-Aire's motion, the district court dismissed the Fund's claim.  But we reversed.  We held the complaint adequately stated a § 515 claim because "the plain language of the contribution requirements as set forth in those documents provided that Four-C-Aire was obligated to pay an exit contribution even after the expiration of the CBA." *Four-C-Aire I*, 929 F.3d at 147.[3]

A summary of our reasoning in that case offers useful context.  First, we accepted as true the Fund's allegation that Four-C-Aire signed on to the CBA.  *Id.*  From there, we found the CBA's text (as alleged) "expressly incorporated" the Fund's trust documents.  *Id.* (cleaned up).  "Thus, Four-C-Aire clearly agreed by signing the CBA to abide by the contribution requirements set forth in the Trust Documents and any amendments to those Documents." *Id.*  So we said we could "look to both the CBA and the Trust Documents to determine the extent of Four-C-Aire's obligations." *Id.*

Second, we found that the Fund adequately alleged that a triggering event occurred under the trust documents, so Four-C-Aire had to pay an exit contribution.  Four-C-Aire

---

[3] In doing so, we readily disposed of Four-C-Aire's contention that the exit contribution wasn't a qualifying "contribution" under § 515. *See Four-C-Aire I,* 929 F.3d at 147 n.15.

8

"ceased having an obligation to contribute to the Fund because of the CBA's expiration; this cessation resulted in an event of withdrawal; but Four-C-Aire did not have to pay the statutory withdrawal liability because of ERISA's *de minimis* rule." *Id.* at 148.[4]

Third, we said that the exit-contribution requirement survived the CBA's expiration. The CBA bound Four-C-Aire to the trust documents *and* any amendments thereto. And in 2015, the Fund amended the trust documents to clarify that an employer's "obligation to pay an Exit Contribution . . . is independent of the Employer's [CBA] and continues to apply after the termination of the [CBA]." *Id.* at 143.

But we also found that the Fund's claim would survive even without the amendment. *Id.* at 148 n.17. The original trust documents conditioned the exit contribution on Four-C-Aire "ceas[ing] to have an obligation to contribute to the fund." *Id*. at 148. So they plainly "required Four-C-Aire to pay an exit contribution upon the expiration of the CBA (if no successor CBA had been reached), even prior to the Amendment." *Id.*

Finally, because the Fund alleged Four-C-Aire refused to pay the exit contribution, it stated a claim for relief under ERISA § 515. *Id.* at 149.

2.

Following remand and discovery, the parties cross-moved for summary judgment. The district court granted the Fund's motion. *Bd. of Trs. Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, No. 16-cv-1613, 2020 WL 5468620, at *12 (E.D. Va.

---

[4] This rule "is intended to eliminate or reduce the withdrawal liability certain employers—generally smaller companies—would owe, to the extent that their calculated withdrawal liability is less than $150,000." *Four-C-Aire I*, 929 F.3d at 143 n.9.

9

Sept. 10, 2020). It found that Four-C-Aire adopted the CBA between the Contractors Association and Local 58 for two reasons.

First, it said that the Wage Sheet the Clothiers signed was a "me-too" agreement,[5] which bound the company to the larger CBA. Alternatively, relying on our decision in *Trustees of the Plumbers & Pipefitters National Pension Fund v. Plumbing Services, Inc.*, 791 F.3d 436, 448 (4th Cir. 2015), the court held that Four-C-Aire adopted the CBA by its conduct.

Then, mirroring our analysis in *Four-C-Aire I*, the district court held that there was no genuine dispute that the CBA incorporated the trust documents; the trust documents required Four-C-Aire to pay an exit contribution; and the exit-contribution requirement survived the CBA's expiration.

After rejecting Four-C-Aire's collateral arguments against the exit-contribution provision's enforceability, the district court assessed $166,958.07 in damages—including the delinquent contribution, interest, and liquidated damages. The court also found that Four-C-Aire owed the Fund reasonable attorneys' fees.[6]

---

[5] A "me-too" agreement is "a contract where an employer agrees to be bound by the terms of a CBA negotiated by a multiemployer association and local union." *Four-C-Aire I*, 929 F.3d at 142 n.4.

[6] The district court has since awarded the Fund $202,766.30 in attorneys' fees. *Bd. of Trs. Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, No. 16-cv-1613, 2021 WL 837341, at *1 (E.D. Va. Feb. 3, 2021). Four-C-Aire has also appealed that order. We agreed to hold that matter in abeyance pending our decision here. Order Granting Appellant's Unopposed Mot. to Hold Case in Abeyance, *Bd. of Trs. Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, No. 21-1235 (4th Cir. June 2, 2022), ECF No. 22.

This appeal followed.

## II.

"We review a grant of summary judgment de novo, applying the same standards as the district court." *DENC, LLC v. Phila. Indem. Ins. Co.*, 32 F.4th 38, 46 (4th Cir. 2022). "Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Defs. Of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (cleaned up). When considering cross-motions for summary judgment, "we resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Id.* at 392–93 (cleaned up).

When facts a party alleges at the dismissal stage prove true after discovery, "the law-of-the-case doctrine [will] continue to govern how the law applies to those facts" at summary judgment. *Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019).

## III.

This case turns on whether Four-C-Aire adopted the CBA between Local 58 and the Contractors Association. If it did, the district court properly granted judgment to the Fund.

11

The law-of-the-case doctrine resolves the remaining issues in the Fund's favor.[7]  In *Four-C-Aire I*, we took as true the Fund's allegations on the contents of the CBA and trust documents.  Our review of the record reveals that the Fund's allegations were true.  So our application of ERISA § 515 principles to the CBA and the Fund's trust documents from *Four-C-Aire I* bind our review here.  *See id.*

As the Fund urges, it's settled that (1) the CBA incorporated the trust documents, including the exit-contribution obligation; (2) the exit contribution is a proper § 515 contribution; (3) assuming Four-C-Aire adopted the CBA, its withdrawal from the Fund triggered the exit-contribution requirement; and (4) that obligation survived the CBA's expiration.  *Four-C-Aire I*, 929 F.3d at 147, 147 n.15, 148–49.

As we'll explain, we agree with the Fund and the district court on the sole remaining issue: Four-C-Aire adopted Local 58's CBA with the Contractors Association by its conduct.

## A.

We begin with general principles.  Multiemployer pension plans enjoy a more favored position under ERISA than at common law.  As third-party beneficiaries to collective-bargaining agreements, plans' ability to recover delinquent contributions from withdrawing employers historically fell victim to an employer's contract defenses against a union.  "Injecting these tangential issues into collection actions consumed plan resources

---

[7] "The law-of-the-case doctrine recognizes that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."  *Graves*, 930 F.3d at 318 (cleaned up).

12

by increasing the cost and delay involved in litigation" and left plans without expected contributions. *Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1021 (4th Cir. 1997). Employee beneficiaries and other employers nationwide bore these costs "through reduced benefits" and "increased contributions." *Id.*

As we explained in *Four-C-Aire I*, "Congress amended ERISA by enacting the Multiemployer Pension Plan Amendments Act of 1980 with the goal of stabilizing plans that had suffered financial setbacks when participating employers ceased contributing to the plan." 929 F.3d at 138. To advance that goal, § 515 allows plans to collect delinquent contributions under a collective-bargaining agreement's plain meaning, "even if an employer might have an otherwise valid common law defense against contribution." *Id.* at 147.

Again, we've already determined that the CBA and incorporated trust documents would require Four-C-Aire to pay the Fund an exit contribution. *See id.* at 147–49. But that premise holds only if Four-C-Aire bound itself to the CBA. We turn to that question now.

13

B.

The outcome here depends on whether Four-C-Aire adopted Local 58's CBA with the Contractors Association, of which Four-C-Aire was a member.[8]  The Fund contends that the Wage Sheet was the signature page to the CBA, and by signing that document, Four-C-Aire joined the agreement in full.  It also argues the district court properly held that the Wage Sheet was a me-too agreement, and that Four-C-Aire adopted the agreement by conduct.  Four-C-Aire counters that it never saw the Standard Form or Addenda; that the Wage Sheet can't be a me-too agreement because it doesn't reference or otherwise incorporate the CBA; and that the company didn't knowingly comply with the CBA, so it didn't adopt the agreement by conduct.

We agree with the Fund that Four-C-Aire adopted the CBA by its conduct.  Because we affirm on that basis, we don't reach the Fund's other arguments.[9]

In *Plumbing Services*, we held that employers can adopt a collective-bargaining agreement by "manifesting an intention to be bound by its terms."  791 F.3d at 448 (citing *Bricklayers Local 21 of Ill. Apprenticeship & Training Program v. Banner Restoration, Inc.,* 385 F.3d 761, 766 (7th Cir. 2004); *Carpenters Amended & Restated*

---

[8] In its opening brief, Four-C-Aire baldly asserts it was never a member of the Contractors Association.  Appellant's Br. at 3.  The record says otherwise.  In the company's letter noticing nonrenewal with Local 58, Aaron Clothier said it had "notified the Central New York Sheet Metal Contractors Association of [its] decision to withdraw from the Association at the end of [their] contract."  J.A. 144.

[9] Our prior statement that "Four-C-Aire entered into a 'me-too agreement'" accepted as true the Fund's allegation that the company signed on to the CBA.  *Four-C-Aire I*, 929 F.3d at 142 n.4.  It's not the law of the case.

*Health Benefit Fund v. Holleman Constr. Co.,* 751 F.2d 763, 770 (5th Cir. 1985); *Trs. of Atlanta Iron Workers, Local 387 Pension Fund v. S. Stress Wire Corp.,* 724 F.2d 1458, 1459–60 (11th Cir.1983)).  There too, a pension fund sought statutory withdrawal liability from an employer, which responded that it "never agreed to be bound by an existing collective bargaining agreement requiring participating employers to make contributions to the Fund."  *Id.* at 440.

We rejected the employer's argument for two reasons.  First, it had signed a "Letter of Assent" agreeing "to be bound by provisions of the [] labor Agreement," under which the obligation to contribute to the Fund arose.  *Id.* at 441, 447–48.  But more importantly, we said that "even if the Letter of Assent alone did not bind [the employer] to make future contributions to the Fund, its conduct certainly did."  *Id.* at 448.[10]  We explained the employer made it "unmistakably clear" that "it intended to be bound" by "contribut[ing] to the Fund in accordance with the governing collective bargaining agreements for thirteen years before its complete withdrawal."  *Id.*

Our sister circuits have identified other actions that might signal an employer's intent to bind itself to a collective-bargaining agreement.  Evidence that an employer paid union wages, remitted union dues, or submitted itself to union jurisdiction (such as in a grievance procedure) all support adoption by conduct.  *See Banner Restoration, Inc.*, 385 F.3d at 766–67 (collecting cases).  Courts have also weighed an employer's use of the

---

[10] Four-C-Aire insists this holding was dictum.  Appellant's Br. at 52 n.11.  It's wrong.  "Where a court makes alternative holdings to support its decision, each holding is binding precedent."  *See United States v. Ford*, 703 F.3d 708, 711 n.2 (4th Cir. 2013).

15

union's hiring halls and submission to a trust fund's audit to the same end. *S. Stress Wire Corp.*, 724 F.2d at 1460.

Here, we're convinced that Four-C-Aire manifested such an intent to be bound by the CBA. For starters, it regularly contributed to the Fund under the agreement's terms throughout the contract period. *See Plumbing Servs.*, 791 F.3d at 448. And while it's true that the Wage Sheet doesn't expressly incorporate the CBA like the Letter of Assent in *Plumbing Services*, it does list all of Four-C-Aire's wage and contribution obligations under the CBA, including those to the Fund. So by signing the Wage Sheet, Four-C-Aire intended to agree to *something*.

There's more evidence still. Four-C-Aire deducted Local 58 union dues from its employees' pay and responded to letters demanding late remittance. *See Banner Restoration, Inc.*, 385 F.3d at 766. Indeed, the Clothiers themselves joined the union. And their membership applications "authorize[d] [Local 58] to represent [them] for purposes of Collective Bargaining, and in [their] behalf, to negotiate and conclude all agreements as to hours of labor, wages, and other conditions of employment." Four-C-Aire's Mot. for Summ. J., Ex. K, *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, No. 16-cv-1613 (E.D. Va. Apr. 17, 2020), ECF No. 96-11.

16

The company also complied with the Fund's payroll audit, which the CBA authorized.[11] *See S. Stress Wire Corp.*, 724 F.2d at 1460. And a Four-C-Aire employee enrolled in Local 58's apprenticeship program.

Four-C-Aire's communications with the union are also telling. After the company first tried to end its relationship with Local 58 (incidentally, referencing its "contract agreements" with the union), the union's business manager responded that its "attempt to terminate the collective bargaining agreement . . . [was] invalid and ineffective," citing two Standard Form provisions. J.A. 145–46. Four-C-Aire didn't respond that there was no CBA or that it had never seen a "Standard Form." Rather, it sent a new notice that complied with the Standard Form's termination procedures.

For these reasons, we agree that Four-C-Aire adopted the CBA between Local 58 and the Contractors Association by its conduct. And as we'll now discuss, none of its contrary arguments persuade us otherwise.

---

[11] Four-C-Aire contends its compliance with the payroll audit doesn't "demonstrate adoption of the collective bargaining agreement by conduct" because "the Fund demanded this in part based on federal law and the force of its prior default judgment." Appellant's Br. at 49. As support, the company points to the district court's statement that "[i]n June of 2015, the Fund notified Four-C-Aire that pursuant to federal law and the CBA, it was authorizing an accountancy firm to conduct a compliance payroll audit." *Four-C-Aire, Inc.*, 2020 WL 5468620, at *3. But the Fund insists it "[did] not have any legal standing to pursue an audit independent of Four-C-Aire's obligations as an employer bound to the CBA," which the company hasn't refuted. Appellee's Br. at 26. That such an audit is allowed under federal law is expected—and irrelevant here.

17

C.

1.

The company first contends that the adoption-by-conduct doctrine violates § 302(c)(5) of the Labor Management Relations Act. The Act requires that "the detailed basis on which [payments to trust funds] are to be made [be] specified in a written agreement with the employer." 29 U.S.C. § 186(c)(5)(B).[12]

*Plumbing Services* forecloses this argument. We—like several of our sister circuits—have held that employers may owe contributions to a benefit plan under a written collective-bargaining agreement if it adopted the agreement by conduct. *Plumbing Servs.*, 791 F.3d at 448.

Nor does this rule conflict with the Labor Management Relations Act. In cases like this, § 302(c)(5) doesn't preclude adoption by conduct because the written CBA and trust documents satisfy the Act's writing requirement. That Four-C-Aire adopted a preexisting

---

[12] The Fund asserts Four-C-Aire waived this argument by failing to argue it in the district court. We disagree. Even though the company didn't expressly argue that the adoption-by-conduct doctrine violated § 302(c)(5), it *did* argue that enforcing the exit-contribution requirement here would do so. Four-C-Aire's Mot. for Summ. J., at 15–17, *Four-C-Aire, Inc.*, No. 16-cv-1613, ECF No. 96. Both here and below, the thrust of the company's argument is that the fact it never signed a document expressly mentioning the exit contribution precludes recovery under § 302(c)(5).

agreement rather than negotiate its own is of no moment—and in any event, typical with multiemployer associations.[13]

Four-C-Aire's authority doesn't help its position. It's true that in *Merrimen v. Paul F. Rost Electric, Inc.*, the Sixth Circuit refused to bind an employer to a collective-bargaining agreement, which it hadn't signed, just because it made voluntary payments to a pension fund for a time. 861 F.2d 135, 139 (6th Cir. 1988). But critically, the agreement in that case "expressly provided that its adoption was to occur *only* through the signing of a 'Letter of Assent.'" *Id.* at 137 (emphasis added).

The Sixth Circuit later clarified *Merrimen*'s reach, explaining that it "did not decide if a collective bargaining agreement negotiated by a multi-employer association that was not signed by an individual employer may satisfy [§ 302's] 'written agreement' requirement." *Nat'l Leadburners Health & Welfare Fund v. O.G. Kelley & Co*, 129 F.3d 372, 374 (6th Cir. 1997). The court then ruled that § 302(c)(5) "is satisfied by a written agreement to which an employer is bound, not a written agreement to which an employer is bound which also carries that employer's signature." *Id.* at 376. Adopting a multiemployer association's written agreement with a union by conduct fits that criterion.

The company's remaining authority falters for the same reason. Neither *Firesheets v. A.G. Building Specialists, Inc.* nor *Moglia v. Geoghegan* considered whether an

---

[13] Confusingly, Four-C-Aire separately concedes that a writing *does* exist. It titles the next section of its brief, "The district court erred in finding that the adoption by conduct doctrine applies when a writing exists." Appellant's Br. at 48. But that's the whole point of the doctrine—to decide whether an employer has bound itself to a written collective-bargaining agreement without signing the document.

19

employer's conduct can bind it to a valid, preexisting agreement between a multiemployer association and a union without violating § 302(c)(5).  *See* 134 F.3d 729, 731 (5th Cir. 1998); 403 F.2d 110, 116–18 (2d Cir. 1968).  And while both courts declined to find adoption by conduct, their decisions were based on insufficient evidence—not tension with federal law.  *See Firesheets*, 134 F.3d at 731–32; *Moglia*, 403 F.2d at 118.

2.

Four-C-Aire next argues it didn't "knowingly compl[y]" with the CBA.  Appellant's Br. at 49.  Put another way, the company claims its conduct only incidentally complied with the agreement.  We're not persuaded.

We first note that the adoption-by-conduct doctrine typically calls for an objective inquiry.  *See Banner Restoration, Inc.*, 385 F.3d at 767–68 (discussing "objective evidence of intent to be bound"); *Holleman Constr. Co.*, 751 F.2d at 770–71 (denying a Fund's claim for want of evidence of "objective conduct . . . manifesting [the employer's] intent to be bound" to the labor agreement).  To be sure, the adoption-by-conduct doctrine would carry little force if all an employer had to do to avoid an adverse ruling was claim it didn't intentionally abide by an agreement's terms.  Unsupported assertions of an employer's subjective intent aren't enough to create a factual dispute in the face of conduct that objectively manifests an intent to be bound.

What's more, we agree with the Fund that Four-C-Aire's actions "necessitated knowledge" of the CBA.  *See* Appellee's Br. at 26.  For example, Four-C-Aire used the Fund's online payment system and remitted union dues.  Before entering the payment portal, the system notifies users: "Submissions are made in accordance with obligations

20

*under applicable collective bargaining agreement(s)* or similar type agreements to which the Employer is signed, *as well as, provisions of all applicable plan rules and trust documents.*"  Decl. of Kenneth Anderson Jr., Ex. 15, *Four-C-Aire, Inc.*, No. 16-cv-1613, ECF No. 92-15 (emphasis added).  So too, the dues-deduction authorization cards, which the Clothiers themselves signed, read:

> This assignment, authorization and direction shall be irrevocable for a period of one year from the date of delivery hereof to you, or until the termination *of the collective bargaining agreement between the Company and the Union* which is in force at the time of delivery of this authorization whichever occurs sooner.

Four-C-Aire's Mot. for Summ. J., Ex. K, *Four-C-Aire, Inc.*, No. 16-cv-1613, ECF No. 96-11 (emphasis added).

And even if we were to assume that Four-C-Aire was wholly ignorant of the CBA and trust documents when it joined the union and began contributing to the Fund (which strains credulity), the company admits it received copies of these documents in May 2015. In its statement of undisputed facts below, Four-C-Aire says it received copies of the Standard Form and trust documents during the Fund's prior action to recover delinquent contributions, for which the Fund received a default judgment.  Four-C-Aire's Mot. for Summ. J., at 7–8, *Four-C-Aire, Inc.*, No. 16-cv-1613, ECF No. 96; *see* Judgment and Order, *Bd. of Trs. Sheet Metal Workers' Nat'l Pension Fund, et al. v. Four-C-Aire, Inc.*, No. 15-cv-00105 (E.D. Va. June 5, 2015), ECF No. 19.  And the company kept contributing to the Fund for nearly a year still.

Through at least these examples, the record shows Four-C-Aire was on notice that it was acting under a collective-bargaining agreement and related trust documents.

21

The company insists that evidence it "paid wages," "made contributions," "responded to letters regarding funds," and "deducted and remitted dues" doesn't prove that it complied with the CBA because the Wage Sheet "specifically mentioned" each payment. Appellant's Br. at 48–49. Not so.

The Wage Sheet says nothing of union dues. Nor does it set out any information on *how* to make payments. It doesn't even list the Fund's full title. While we must draw all reasonable factual inferences in Four-C-Aire's favor, it's implausible that anyone could comply with payment obligations under the CBA based only on the barebones list of contribution requirements in the Wage Sheet.

Relatedly, Four-C-Aire argues it didn't comply with some CBA terms, which "show[s] its lack of intent to adopt" the agreement. Appellant's Br. at 50. We disagree. The company doesn't detail its noncompliance in its opening brief, but it argued in the district court that it (1) failed to post bond to the union; (2) didn't (at first) follow mandatory online reporting; (3) never used the union's hiring hall; and (4) allowed its employees to use personal tools, which violated the CBA. *Four-C-Aire, Inc.*, 2020 WL 5468620, at *6.

We agree with the district court that this evidence doesn't raise genuine factual disputes for trial because (1) Local 58 could waive the bond requirement under the CBA; (2) Four-C-Aire later switched to the online reporting system, as required; and (3) there was no requirement that Four-C-Aire use Local 58's hiring hall—it's simply a benefit of which the company declined to avail itself. *Id.*

Four-C-Aire disputes none of this. And while it's true the company didn't abide by the CBA's ban on using personal tools, we don't think that alone creates a genuine dispute

22

of fact on whether it objectively manifested its intent to adopt the agreement. *See Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) ("To create a genuine issue for trial, the nonmoving party must rely on more than . . . a scintilla of evidence." (cleaned up)).

3.

Finally, Four-C-Aire tries in vain to distinguish *Plumbing Services*. It leans on the fact that the employer in that case signed a Letter of Assent in which it agreed to "make contributions to the . . . [Plumbers and Pipefitters National] Pension Fund . . . as provided for by the [labor] Agreements." Appellant's Br. at 51–52 (quoting *Plumbing Servs.*, 791 F.3d at 441). The company (fairly) points out that the Wage Sheet it signed doesn't contain such language.

But that omission isn't dispositive. While we said that the Letter of Assent in *Plumbing Services* was the "most obvious manifestation" of the company's intent, we also said that the company's regular contributions to the Fund made its intent "unmistakably clear." *Plumbing Servs.*, 791 F.3d at 448. And besides, as we've discussed, there's other evidence of Four-C-Aire's intent to adopt the CBA that wasn't present in *Plumbing Services*.

The company also contends that, unlike the employer in *Plumbing Services*, it "paid no portion of its fund contributions on a prescribed regular basis." Appellant's Br. at 52. The record belies this assertion.

Four-C-Aire's own statement of undisputed facts below admits it "made fund payments under the Wage Sheet until April 30, 2016." Four-C-Aire's Mot. for Summ. J.,

23

at 12, *Four-C-Aire, Inc.*, No. 16-cv-1613, ECF No. 96. Indeed, the company remitted thousands of dollars to the Fund throughout the contract period.

And if Four-C-Aire meant to reference its regular delinquency in underpaying the Fund, that fact cuts against the company, not for. As we've mentioned, the Fund has already obtained a separate default judgment against Four-C-Aire to collect these amounts under the CBA, which (if anything) supports again holding the company to the agreement here. *See* Judgment and Order, *Four-C-Aire, Inc.*, No. 15-cv-00105, ECF No. 19 ("Judgment by default in the total sum of $29,892.96 is entered pursuant to 29 U.S.C. § 1132(g)(2), *Defendant's collective bargaining agreement(s)*, and the Funds' Trust Document." (emphasis added)).

Four-C-Aire lastly posits that "other authority runs counter to *Plumbers*," citing a Sixth Circuit case. Appellant's Br. at 52 (citing *Cent. States, SE & SW Areas Pension Fund v. Gen. Materials, Inc.*, 535 F.3d 506, 508 (6th Cir. 2008)). But of course, if out-of-circuit precedent conflicts with our own, ours controls.

In sum, we reject Four-C-Aire's efforts to resist the adoption-by-conduct doctrine and conclude it "manifest[ed] an intention to be bound by [the CBA's] terms." *Plumbing Servs.*, 791 F.3d at 448.

IV.

Four-C-Aire raises several other arguments on why we shouldn't enforce the exit-contribution requirement in the trust documents. None persuades.

To start, Four-C-Aire appears to contest the district court's jurisdiction. It says that "[t]he exit contribution is not statutory withdrawal liability," so it's an unrecoverable post contract obligation under ERISA § 515. Appellant's Br. at 37. The company is wrong. We've already held that "exit contributions operate as a subset of withdrawal liability payments," so "it follows that exit contributions also constitute a contribution under ERISA § 515." *Four-C-Aire I*, 929 F.3d at 147 n.15. There's no jurisdictional defect here.

The company also insists our decision creates a circuit split with the First Circuit's opinion in *Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment & Allied Industries Fund*, 967 F.2d 688 (1st Cir. 1992). Again, this isn't so.

It's true the First Circuit held that a benefit fund couldn't unilaterally impose withdrawal liability on an employer through a post-contract amendment. *Id.* at 694. But the original trust documents in that case didn't contain any withdrawal-liability provision—they only authorized the trustees to "establish a policy and method of funding." *Id.* at 693 (cleaned up). Here, the trust documents in effect when Four-C-Aire adopted the CBA required an exit contribution. So *Manchester Knitted Fashions* isn't on point.

Next, Four-C-Aire contends it repudiated its contract with Local 58, which ended its exit-contribution obligation. Not true.

Under the CBA, employers waive their right to repudiate the agreement. But even assuming the company *could* lawfully repudiate the CBA, it didn't. Rather, after Local 58 told Four-C-Aire that its letter seeking to end their relationship violated the CBA, the company responded with a new letter noticing nonrenewal once the agreement expired. So Four-C-Aire never repudiated the agreement—both parties kept performing until its end.

25

The company also argues that collecting exit contributions violates the Labor Management Relations Act § 302's requirement that an employer's contribution to a trust fund be for the "sole and exclusive benefit of the employees of such employer, and their families and dependents." 29 U.S.C. § 186(c)(5); Appellant's Br. at 53–56. But the company ignores the rest of the provision, which adds that the funds can benefit "such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents." 29 U.S.C. § 186(c)(5). This is the very promise of multiemployer pension plans. *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 637–38 (1993) ("[T]he nature of multiemployer plans" is that they "operate by pooling contributions and liabilities," and "[a]n employer's contributions are not solely for the benefit of its employees . . . alone").

And to boot, we've already held that the exit contribution "operate[s] as a subset of withdrawal liability," which (of course) no one contends violates § 302. *Four-C-Aire I*, 929 F.3d at 147 n.15. So it's a proper "contribution" under ERISA § 515. *Id.*; *see also Plumbing Servs.*, 791 F.3d at 445 ("An action to compel an employer to pay overdue withdrawal liability is treated the same as an action to collect delinquent contributions.").

Last, Four-C-Aire complains that the Fund's governing documents violate § 302 because "there [is] no evidence the Fund operates as a qualifying 'trust fund.'" Appellant's Br. at 57 (cleaned up). It argues there was "no signed Declaration of Trust in existence at the time of signing the Wage Sheet," so employer-contribution requirements (including the exit contribution) are unenforceable. Appellant's Br. at 58 (quoting *Bricklayers, Masons & Plasterers Int'l Union, Loc. No. 15 v. Stuart Plastering Co*, 512 F.2d 1017, 1029 (5th

26

Cir. 1975)).  The company relies on *Stuart Plastering*—in which the Fifth Circuit refused to enforce payment obligations in an *unexecuted* trust document—to support its claim of deficiency under the Labor Management Relations Act.  512 F.2d at 1020, 1023 n.8.

We agree with the Fund that Four-C-Aire failed to preserve this argument for appeal.  In the district court, the company argued only that "the Fund offered no evidence of trustee voting creating the exit contribution provision."  Four-C-Aire's Mot. for Summ. J., at 19, *Four-C-Aire, Inc.*, No. 16-cv-1613, ECF No. 96.  There, the company focused on the lack of evidence that the trustees' vote on the exit contribution was unanimous.  *See id.* This is a very different argument than the one the company makes here, which urges that— on the whole—the Fund is a noncomplying trust under § 302(c)(5).[14]

True, Four-C-Aire did say in the district court that the Fund hadn't produced "a single trust agreement signed by its trustees," and so "the Fund cannot meet its burden of proving a valid, formal, written trust agreement existed."  Four-C-Aire's Mot. for Summ. J., at 19, *Four-C-Aire, Inc.*, No. 16-cv-1613, ECF No. 96 (cleaned up).  But "[a] skeletal 'argument,' really nothing more than an assertion, does not preserve a claim.  Especially not when the brief presents a passel of other arguments, as [Four-C-Aire]'s did.  Judges are not like pigs, hunting for truffles buried in briefs."  *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam).

---

[14] Four-C-Aire hasn't pressed the unanimity issue on appeal, following the district court's ruling that "neither the statute nor the cases cited by Four-C-Aire impose that requirement on the Board."  *Four-C-Aire, Inc.*, 2020 WL 5468620, at *9.

27

Four-C-Aire's argument that the Fund wasn't a qualifying trust was no more than that, and we won't fault the Fund (or, for that matter, the district court) for failing to sniff it out. As the Fund points out, had Four-C-Aire more squarely presented this issue below, it would have had the opportunity to produce the documents the company now claims simply don't exist. *See* Appellee's Br. at 48 n.20; *United States v. Hodge*, 902 F.3d 420, 429 (4th Cir. 2018) ("[I]t is unfair to allow parties to surprise one another with new arguments they did not make at the appropriate procedural juncture." (cleaned up)).

In any event, even if Four-C-Aire had preserved the issue, it's meritless. The record contains several iterations of the written trust documents, including those imposing the exit-contribution requirement. And the Fund's Director of Operations verified each version of the document in a declaration to the district court.

Beyond that, we're unfazed by the lack of signature page to the trust documents in the record. *Stuart Plastering* doesn't counsel otherwise. In that case, the union "admit[ted] that the declaration of trust was never executed in fact." *Stuart Plastering*, 512 F.2d at 1023 n.8. The Fund admits nothing of the sort here.

Nor is there any evidence the trust documents are invalid. And we decline the company's request that we infer from the lack of signature page that the Fund has, for many years, been operating illegally under unexecuted trust documents.[15]

---

[15] Four-C-Aire also argues that the unsigned trust documents are hearsay that the district court shouldn't have considered, but it waived that argument by failing to raise it below. *See* Appellant's Br. at 59–60; Reply Br. at 30–31.

Four-C-Aire's related challenges to the 2015 amendment to the exit-contribution requirement too must fail. The company argues there's no evidence the trustees voted to amend the trust documents or followed proper voting procedures. Even if that were true, it's irrelevant.

We held in *Four-C-Aire I* that the exit-contribution requirement survived the CBA's expiration under the plain meaning of the trust documents in effect when Four-C-Aire signed the Wage Sheet. So the outcome here is the same regardless of the amendment's validity.

In short, Four-C-Aire offers no reason why we shouldn't enforce the plain terms of the agreement and trust documents, as ERISA requires. The district court's judgment is

*AFFIRMED.*

29