**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 21-2134**

———————

SHEET METAL WORKERS' HEALTH & WELFARE FUND OF NORTH CAROLINA; SHEET METAL WORKERS' UNION TRAINING FUND OF NORTH CAROLINA; SHEET METAL WORKERS' NATIONAL PENSION FUND; INTERNATIONAL TRAINING INSTITUTE FOR THE SHEET METAL AND AIR CONDITIONING INDUSTRY; NATIONAL ENERGY MANAGEMENT INSTITUTE COMMITTEE FOR THE SHEET METAL AND AIR CONDITIONING INDUSTRY; SHEET METAL OCCUPATIONAL HEALTH INSTITUTE TRUST; NATIONAL STABILIZATION AGREEMENT OF THE SHEET METAL INDUSTRY; SHEET METAL WORKERS' INTERNATIONAL SCHOLARSHIP FUND,

Plaintiffs – Appellees,

v.

STROMBERG METAL WORKS, INC.,

Defendant – Appellant,

and

TRIANGLE SERVITEK, LLC; JOEL GARCIA CASTILLO; JAZMIN CASTREJON.

Defendants.

———————

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  Terrence W. Boyle, District Judge.  (5:21-cv-00101-BO)

———————

Argued:  January 25, 2023                    Decided:  October 3, 2024

———————

Before KING and RUSHING, Circuit Judges, and FLOYD, Senior Circuit Judge.

_____

Affirmed in part, vacated in part, and remanded by published opinion. Judge King wrote the opinion, in which Judge Rushing and Senior Judge Floyd joined.

_____

**ARGUED:** Douglas Ray Pierce, KING & BALLOW, Nashville, Tennessee, for Appellant. Karla M. Campbell, BRANSTETTER, STRANCH & JENNINGS, PLLC, Nashville, North Carolina, for Appellees. **ON BRIEF:** Michael D. Oesterle, KING & BALLOW, Nashville, Tennessee; Kirsten E. Small, NEXSEN PRUET, LLC, Greenville, North Carolina, for Appellant. Narendra K. Ghosh, PATTERSON HARKAVY, LLP, Chapel Hill, North Carolina; Diana Migliaccio Bardes, MOONEY, GREEN, SAINDON, MURPHY & WELCH, PC, Washington, D.C., for Appellees.

_____

KING, Circuit Judge:

In this civil action on appeal from the Eastern District of North Carolina, the eight plaintiffs are multiemployer benefit plans (collectively, the "Funds") seeking to recover delinquent contributions for health, pension, and other sheet metal worker benefits from defendant Stromberg Metal Works, Inc.[1]  For reasons explained in its Order of September 2021, the district court denied Stromberg's motion for summary judgment, granted the Funds' cross-motion for summary judgment, and awarded the Funds more than $823,000 in delinquent contributions and more than $430,000 in liquidated damages and interest on the delinquency.  *See Sheet Metal Workers' Health & Welfare Fund of N.C. v. Stromberg Metal Works, Inc.*, No. 5:21-cv-00101 (E.D.N.C. Sept. 22, 2021), ECF No. 116 (the "Summary Judgment Order").  Stromberg has appealed, challenging the court's rulings as to both liability and damages.  As explained herein, we affirm the court's liability ruling. We also largely agree with the court's damages ruling, but we are constrained to vacate that ruling and remand for further proceedings on certain damages-related issues.

---

[1] The eight plaintiff Funds are:  the Sheet Metal Workers' Health and Welfare Fund of North Carolina; the Sheet Metal Workers' Union Training Fund of North Carolina; the Sheet Metal Workers' National Pension Fund; the International Training Institute for the Sheet Metal and Air Conditioning Industry; the National Energy Management Institute Committee for the Sheet Metal and Air Conditioning Industry; the Sheet Metal Occupational Health Institute Trust; the National Stabilization Agreement of the Sheet Metal Industry; and the Sheet Metal Workers' International Scholarship Fund.

3

I.

A.

This action was initiated by the plaintiff Funds in November 2019 in the Middle District of Tennessee, and it was subsequently transferred in March 2021 to the Eastern District of North Carolina.  The Complaint alleges that defendant Stromberg contravened § 515 of the Employee Retirement Income Security Act of 1974 ("ERISA"), *see* 29 U.S.C. § 1145, by underpaying contributions owed to the Funds pursuant to a collective bargaining agreement ("CBA") with the Sheet Metal, Air, Rail and Transportation Union (the "SMART Union").  *See Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, 42 F.4th 300, 306 (4th Cir. 2022) (recognizing that ERISA § 515 "allows multiemployer benefit plans to collect delinquent contributions from employers under the plain terms of their [CBA]").[2]  The allegedly delinquent contributions relate to temporary sheet metal workers hired by Stromberg through staffing agencies between 2015 and 2019 in eastern North Carolina.

Following discovery, in October 2020, the parties filed their cross-motions for summary judgment in the Tennessee district court.  In June 2021, this action having been transferred to it with those motions still pending, the North Carolina district court conducted a hearing on the summary judgment motions.  The North Carolina district court

---

[2] The Complaint also invokes § 301(a) of the Labor Management Relations Act, *see* 29 U.S.C. § 185(a), which generally authorizes federal actions for CBA violations.

4

also obtained post-hearing supplemental memoranda from the parties prior to issuing its

Summary Judgment Order of September 2021.

B.

As set forth in the district court's Summary Judgment Order, the record reflects the

following:

> The plaintiff Funds are employee welfare and pension benefit plans and joint labor-management organizations. Defendant Stromberg is a commercial sheet metal fabrication and installation company with a regional office in Raleigh, North Carolina. Stromberg employs workers represented by Local 5 and Local 100 of the SMART Union and has been a signatory to their CBAs.[3] The CBAs govern, among other things, working conditions, rates of pay, and benefits for workers performing sheet metal work as defined by the CBAs. The CBAs provide for four classifications of workers performing sheet metal work under the CBAs: journeyman, apprentice, pre-apprentice, and classified. The CBAs further provide for a ratio of journeyman to non-journeyman metal workers that Stromberg and other employer-signatories must follow. The Local 5 CBA requires employer-signatories to maintain a 1-to-2 ratio of journeyman to non-journeyman sheet metal workers, or one journeyman to one apprentice and one pre-apprentice or classified worker.
>
> In addition to setting staffing ratios, the CBAs also set contribution rates at which employer-signatories such as Stromberg contribute to the Funds for the benefit of employee-participants. An employer is required to make contributions for employees as classified by the CBA and other labor negotiation agreements. The hourly contribution rates are significantly higher for journeymen (e.g., $6.60 pension, $5.25 health) and apprentices ($4.49 averaged pension, $5.25 health) than classified workers ($0.33 pension, $1.29 health).

*See* Summary Judgment Order 2-3 (cleaned up).

---

[3] Although the Summary Judgment Order discussed both Local 5 and Local 100, it ultimately focused on Local 5 and its CBA "because all of the temporary sheet metal workers addressed herein worked in the Local 5 jurisdiction in North Carolina." *See* Summary Judgment Order 3 n.2.

5

After setting forth the foregoing facts concerning the parties and the pertinent CBA provisions, the district court turned to the facts regarding Stromberg's temporary sheet metal workers:

> Local 5 and Local 100 operate a hiring hall which, under the CBAs, employer-signatories such as Stromberg are obligated to use as a first source of hiring. However, the CBAs permit employers to hire workers not referred by the local unions under certain circumstances. When workers are hired outside the local unions, the CBAs require that the employer refer the worker to the local union for assessment of proper classification, including wage rate. Stromberg used the services of five temporary staffing agencies, including Triangle Servitek, LLC.[4] Workers hired by Stromberg from a temporary staffing agency performed the same type of sheet metal work for Stromberg as Stromberg employees. Although required by the CBA, Stromberg did not refer every worker it hired outside Local 5 to the union hall for assessment and classification as a journeyman, apprentice, pre-apprentice, or classified worker.

*See* Summary Judgment Order 3-4 (cleaned up).

Next, the district court addressed modifications to the Local 5 CBA referred to as "Resolution 78 Agreements":

> A Resolution 78 Agreement is a local agreement between employers and local unions to amend terms applicable to a particular job site. Resolution 78 Agreement terms are typically more favorable to the employer, allowing the employer to bid for work more competitively over non-union employers. Stromberg and Local 5 entered into two Resolution 78 Agreements regarding projects in North Carolina — the Mary Ellen Jones Project and the New Bern Project. Both the Mary Ellen Jones and New Bern Project Resolution 78 Agreements set out terms more favorable to Stromberg, including the ratio of worker classification on the project. The Mary Ellen Jones and New Bern Project Resolution 78 Agreements are each one of the documents that govern the amount of contributions Stromberg was

---

[4] Along with defendant Stromberg, the Complaint names as defendants Triangle Servitek and its agents Joel Garcia Castillo and Jazmin Castrejon, but those additional defendants had been dismissed with the Funds' consent by the time of the Summary Judgment Order and are not parties to this appeal.

required to make to the plaintiff Funds during the time period for which the Funds have sought delinquent contributions in this case.

*See* Summary Judgment Order 4 (cleaned up).

The district court then discussed grievances that Stromberg and Local 5 had filed against each other — and the resulting settlement agreements — concerning the use of temporary sheet metal workers:

In April 2017, Local 5 filed a grievance alleging that Stromberg had violated the CBA by using temporary sheet metal workers. Specifically, Local 5 alleged that Stromberg had violated union hall hiring procedures and requested that all hours performed by non-referred bargaining unit employees be paid to the local union and that the plaintiff Funds be made whole. Stromberg then filed its own grievance against Local 5, alleging that Local 5 was unable to provide manpower needs for apprentices, pre-apprentices, and classified workers in the ratios agreed to under the CBA. On July 14, 2017, Stromberg and Local 5 settled their dispute and entered into a grievance settlement agreement.

In October 2018, Local 5 filed another grievance under the CBA relating to Stromberg's use of temporary sheet metal workers. Local 5 argued that Stromberg had circumvented hiring hall procedures and subcontracted work to companies/employees who were not signatories with Local 5. Local 5 requested that Stromberg make it whole for all lost wages, benefits, assessments, and damages caused by Stromberg's violation of the CBA. In December 2018, a meeting was held on the October grievance at which Joseph Powell, a trustee of the plaintiff Sheet Metal Workers' National Pension Fund and a representative of the SMART Union, and Karla Campbell on behalf of the plaintiff Sheet Metal Workers' Health and Welfare Fund of North Carolina, among others, were present. Mr. Powell reviewed a draft of a settlement agreement and in an email sent on January 3, 2019, indicated that the provisions of the eventual settlement agreement would be retroactive. Local 5's grievance was settled by a final settlement agreement signed January 14, 2019 (the "2019 Settlement"). Paragraph 14 of the 2019 Settlement provides that "Stromberg agrees to let go all temporary workers by January 31, 2019. In return, Local 5 agrees not to go back against Stromberg for working dues, lost wages etc. based on the hiring of temporary workers. Additionally, Local 5 will withdraw the pending grievance against Stromberg related to the hiring of temporary workers." The 2019 Settlement was signed by representatives of Local 5 and Stromberg. The 2019

7

> Settlement settled Local 5's and Stromberg's dispute regarding the applicability of the terms in the CBA to an audit that had been conducted by the plaintiff Funds.

*See* Summary Judgment Order 4-5 (cleaned up) (quoting J.A. 68).[5]

Finally, regarding the audit that had been conducted by the plaintiff Funds prior to the 2019 Settlement, the district court explained:

> The Funds are governed by their plan trust documents and the CBA, though they do not participate in the bargaining between the union and employers. Thus, the Funds must rely on reports that signatory-employers like Stromberg submit to them and they are permitted to audit employers to ensure compliance with the CBA. In November 2017, during a meeting of the Board of Trustees of the plaintiff Sheet Metal Workers' Health and Welfare Fund of North Carolina, the trustees concluded that a payroll audit of Stromberg was needed. This decision was made following an issue that had arisen regarding Stromberg's reporting practices for temporary sheet metal workers. In June 2017, Stromberg had begun submitting reports and payments reflecting the lowest worker classification rate to the Funds on behalf of some temporary sheet metal workers. The trustees determined that an audit was mandatory to clarify what contributions should be received by the Funds and on whose behalf. Stromberg contends that it did not believe at the time that it owed any contribution to any of the Funds for the temporary sheet metal workers, but that it made contributions to "buy its peace" because Local 5 believed otherwise.

*See* Summary Judgment Order 5-6 (cleaned up). The court also clarified that the audit was actually conducted by a third-party auditor on the Funds' behalf, and that the Funds initiated this civil action following their receipt of the audit. *Id.* at 6.

---

[5] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

C.

The district court began its analysis in the Summary Judgment Order by recognizing that multiemployer benefit plans — such as the plaintiff Funds — "come with benefits for both workers and employers," in that workers "'receive benefits that follow them throughout jobs within a particular industry, and employers are able to offer those benefits while taking advantage of cost- and risk-sharing mechanisms.'" *See* Summary Judgment Order 10 (quoting *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, 929 F.3d 135, 138 (4th Cir. 2019)).  The court further recognized that ERISA § 515 affords a means for multiemployer benefit plans to collect delinquent employer contributions, by providing:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

*See* 29 U.S.C. § 1145; *see also* Summary Judgment Order 10.  As the court explained, "Section 515 actions are intended to streamline the process of collection of delinquent contributions to ensure that the benefit plans remain funded."  *See* Summary Judgment Order 10-11 (citing *Four-C-Aire*, 929 F.3d at 140).

From there, the district court proceeded to identify the issues on which the parties agreed.  Those included that the plaintiff Funds "are multiemployer pension and welfare plans" and that defendant Stromberg "is an employer," as ERISA defines the various terms. *See* Summary Judgment Order 11 (citing 29 U.S.C. § 1002).  The undisputed issues also included that Stromberg is a signatory to the Local 5 CBA; that the CBA sets forth "a ratio

9

of journeymen to non-journeymen that signatory employers such as Stromberg must follow"; that the CBA generally "require[s] Stromberg to maintain a 1-to-2 employment ratio of journeymen to non-journeymen"; and that the CBA "further require[s] Stromberg to make contributions to the plaintiff Funds." *Id.*

That brought the district court to the issues on which the parties disagreed. *First*, the court considered "whether the temporary sheet metal workers hired by Stromberg through staffing agencies were employees of Stromberg covered by the CBA," such that Stromberg was obliged under ERISA to make contributions to the Funds related to the temporary sheet metal workers. *See* Summary Judgment Order 11. Primarily because "Stromberg hired the temporary sheet metal workers to perform work that is a regular part of its business and Stromberg controlled where and how long the temporary sheet metal workers would work and told them what to do," the court concluded "that the temporary sheet metal workers were Stromberg employees for purposes of ERISA." *See id.* at 12-13 (applying test outlined in *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1992)).

*Second*, the district court addressed Stromberg's assertion that it was not required to make contributions to the Funds related to the temporary sheet metal workers because the CBA expressly provides that "contributions are due only for four specific classes of employees — journeyman, apprentice, pre-apprentice, and classified" — and "'temporary worker' is not one of the listed classifications." *See* Summary Judgment Order 14. The court rejected that contention, emphasizing that "the temporary sheet metal workers were not classified by Local 5 as journeyman, apprentice, pre-apprentice, or classified because,

as it admits, Stromberg did not send all of its temporary sheet metal workers to the union hall for classification in violation of the CBA." *Id.* To rule otherwise, the court reasoned, would reward Stromberg "for its failure to comply with the terms of the CBA" and would thereby "go against the intent of Section 515 actions." *Id.*

*Third*, the district court took up Stromberg's argument that its 2019 Settlement with Local 5 relieved it of any obligation to make contributions to the Funds related to the temporary sheet metal workers. *See* Summary Judgment Order 14. The court deemed that argument to be "unavailing" and determined that the 2019 Settlement, being "between Local 5 and Stromberg," is "not binding on the plaintiff Funds" and does not "preclude the Funds from seeking delinquent contributions from Stromberg." *Id.* at 14-15. In so concluding, the court invoked decisions of this Court and of another district court within our Circuit. *Id.* (citing *Four-C-Aire*, 929 F.3d at 140; *Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1021 (4th Cir. 1997); *Int'l Painters & Allied Trades Indus. Pension Fund v. Madison Coatings Co.*, No. 1:17-cv-01559, 2019 WL 5625759, at *4 (D. Md. Oct. 31, 2019)). The court also determined that it "is immaterial" that representatives of the Funds were present at the December 2018 meeting regarding the October 2018 grievance that had been filed by Local 5 against Stromberg and that was later resolved by the 2019 Settlement. *Id.* at 15 n.5.

*Fourth*, the district court evaluated whether Stromberg can rely on the proposition "that the CBA does not include an express promise to make contributions to the Funds for work by temporary sheet metal workers." *See* Summary Judgment Order 15. Concluding that the answer is no, the court explained that — in light of the CBA's plain terms covering

11

"'the rates of pay and conditions of employment of all employees of the employer engaged in' sheet metal work," *id.* at 11 (quoting J.A. 79) — the CBA "refers to all, not some employees." *Id.* at 15 (citing *Clark v. Ryan*, 818 F.2d 1102, 1105 (4th Cir. 1987) (similarly recognizing that where a CBA designated the union as the exclusive bargaining representative for "all" employees, the term "employees represented by Local 697" included both union members and non-members)).

*Fifth*, the district court analyzed whether Stromberg can rely on evidence "that no temporary sheet metal workers have made any claims to the Funds for benefits." *See* Summary Judgment Order 15. Again concluding that the answer is no, the court explained that it is irrelevant "that there have been no claims to the Funds by temporary sheet metal workers" and that it would yet be irrelevant "even if Stromberg could establish that the temporary sheet metal workers are not eligible for and would never receive any fringe benefits from the Funds." *Id.* at 16 (internal quotation marks omitted). According to the court, that is because "the harm the Funds seek to remedy through this action" is not the past or possible future provision of benefits to Stromberg's temporary sheet metal workers; rather, it is Stromberg's underpayment of contributions that the Funds rely on "to finance the defined benefits due to [eligible] beneficiaries." *Id.* (internal quotation marks omitted).

*Sixth*, the district court considered whether, as Stromberg argued, the Funds cannot be awarded any delinquent contributions without an accounting based on the actual classification of each temporary sheet metal worker (i.e., journeyman, apprentice, pre-apprentice, or classified), or whether, as the Funds asserted, they can rely on the "default" staffing ratio set forth in the CBA to show the contributions owed. *See* Summary Judgment

12

Order 16. The court adopted the Funds' position that they can rely on the CBA's staffing ratio for several reasons, including that "Stromberg admittedly failed to refer its temporary sheet metal workers to the union hall for classification" and "has not cited any case in which a court required a benefit fund in a Section 515 action to make a showing as to the classification of each worker for whom contributions are owed." *Id.*

*Seventh*, the district court addressed Stromberg's contention that the Funds cannot rely on their third-party audit of Stromberg to establish the amount of the delinquent contributions because the audit constitutes "inadmissible hearsay." *See* Summary Judgment Order 17. As the court explained, the Funds used the audit reports and the CBA's "default" staffing ratio — "a 1-to-2 ratio of journeymen to non-journeymen" — to determine that "the amount of the delinquency owed by Stromberg for the relevant period, 2015-2019, is $823,658.24." *Id.* Additionally, the Funds tallied "the liquidated damages and interest due as totaling $430,658.16." *Id.* Three representatives of the Funds gave declarations regarding their use of the audit reports to reach those figures, and two provided copies of the audit reports with their declarations. *Id.* at 17-18.

Meanwhile, Stromberg did not dispute that the "Funds have the authority to audit employers or that the [Funds'] audit [of Stromberg] was conducted by an independent third-party." *See* Summary Judgment Order 17. Moreover, the district court did not perceive any argument that the audit reports provided by the Funds "are not authentic." *Id.* at 18. Rather, the court understood Stromberg to lodge only a hearsay challenge to the admissibility of the audit reports, on the theory that the Funds "have provided no evidence that the numbers in these reports are accurate," and that the declarations of the three

13

representatives of the Funds "are insufficient grounds on which to admit the audit reports as [the declarants] did not participate in the audit and have no personal knowledge of the information contained therein." *Id.* at 17. Rejecting that challenge, the court faulted Stromberg for "fail[ing] to cite any legal authority suggesting that an auditor or an affiant relying on an audit must physically observe each employee performing covered employment for a court to rely on the audit or affidavit." *Id.* at 18 (internal quotation marks omitted).

*Eighth*, the district court evaluated whether Stromberg has proffered sufficient evidence in these proceedings to create a genuine issue of material fact as to the amount of damages and the accuracy of the Funds' determination thereof. Specifically, the court noted that Stromberg "challenges the contents of the audit reports," but the court concluded that Stromberg "fails to create a genuine issue of material fact by filing specific, documentary evidence to this Court demonstrating that erroneous calculations on particular employees form the basis of the Funds' damages claims." *See* Summary Judgment Order 18 (alteration and internal quotation marks omitted).

*Ninth and finally*, the district court dealt with Stromberg's argument that, even if the Funds can rely on a "default" staffing ratio to determine their damages, the Funds cannot use the CBA's ratio and instead must use the modified ratio in the Resolution 78 Agreements regarding the Mary Ellen Jones and New Bern Projects. *See* Summary Judgment Order 18. In disagreeing with Stromberg on that point, the court invoked the Funds' evidence "that 'Stromberg did not produce payroll records that would permit the auditor to apply the Resolution 78 variances to the audits.'" *Id.* (quoting J.A. 2002

14

(declaration of Kenneth Anderson, the audit and delinquency manager for the Sheet Metal Workers' National Benefit Funds)). Additionally, the court pointed to Stromberg's own evidence reflecting "that it had the opportunity both to dialogue with and provide information to the auditor" but "did not have complete and accurate payroll records to provide." *Id.* at 19 (citing J.A. 466, 2049, 2051 (declarations of Kathleen Bigelow, the Stromberg owner/employee responsible for calculating the contributions to be made to the Funds)). The court also recognized that "[a]though Stromberg contends that Mr. Anderson's statement about the production of payroll records is false, it has not come forward with any documentary evidence which would raise a genuine issue of material . . . fact on this issue." *Id.*

Based on the evidence before it, the district court indicated that Stromberg violated ERISA's requirement for "employers to maintain records with respect to each employee sufficient to determine any benefits which are or may become due." *See* Summary Judgment Order 18 (citing 29 U.S.C. § 1059(a)(1)). The court also indicated that Stromberg bears but has failed to satisfy the burden of proof engendered by ERISA's recordkeeping requirement, explaining that the recordkeeping requirement "affects evidentiary burdens such that, when a plaintiff demonstrates the defendant's failure to comply . . . , the burden of proving the accuracy of employment or benefit records shifts to the defendant." *Id.* at 18-19 (alteration in original) (quoting *Colin v. Marconi Com. Sys. Emps.' Ret. Plan*, 335 F. Supp. 2d 590, 606 (M.D.N.C. 2004)). Because of Stromberg's blame for the "insufficient records to allow the auditor to apply the Resolution 78 ratio,"

15

the court resolved that the Funds "are permitted to rely on the ratio agreed to by Stromberg in the CBA." *Id.* at 19.

### D.

Ultimately, by its liability ruling, the district court concluded that the plaintiff Funds "are entitled to summary judgment in their favor on the [matter of defendant Stromberg's liability for the underpayment of contributions to the Funds]." *See* Summary Judgment Order 16. And, by its damages ruling, the court concluded that the Funds "are entitled to summary judgment in their favor on their claim for damages in the amount requested." *Id.* at 19. Accordingly, the court denied Stromberg's motion for summary judgment, granted the Funds' cross-motion for summary judgment, and pronounced that the Funds "are awarded $823,658.24 in delinquent contributions for the audit period plus liquidated damages and interest on the delinquency in the amount of $430,658.16." *Id.*

Stromberg timely noted this appeal from the district court's judgment, and we possess jurisdiction pursuant to 28 U.S.C. § 1291. On appeal, Stromberg maintains that it is entitled to summary judgment and thus requests us to reverse the judgment in favor of the Funds and to order the entry of judgment in its favor. Alternatively, Stromberg would have us vacate and remand for further proceedings.[6]

---

[6] In October 2021, following the entry of judgment and Stromberg's notice of appeal, the Funds filed a motion in the district court for attorneys' fees and costs and for a supplemental award of interest. *See* Summary Judgment Order 20 (directing the Funds to file such a motion within 21 days). The district court subsequently denied the Funds' motion without prejudice to refiling it at the conclusion of this appeal.

II.

This Court reviews de novo a district court's disposition of cross-motions for summary judgment. *See Fusaro v. Howard*, 19 F.4th 357, 366 (4th Cir. 2021). "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *See Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 354 (4th Cir. 2011). Under that standard, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a).

III.

In its appeal, defendant Stromberg pursues a single argument regarding the district court's liability ruling and multiple arguments concerning the court's damages ruling. We address those contentions in turn.

A.

With respect to liability, Stromberg has abandoned most of the arguments that it raised in the district court, leaving only the contention that its 2019 Settlement with Local 5 relieved it of any obligation to make contributions to the plaintiff Funds related to the temporary sheet metal workers (the third contested issue addressed in the Summary Judgment Order). Like the district court, we conclude that Stromberg's contention lacks merit.

17

Stromberg maintains — and the Funds dispute — both that the terms of the 2019 Settlement excused Stromberg from making contributions to the Funds and that the 2019 Settlement is binding on the Funds even though it was not a party to that settlement agreement. In rejecting Stromberg's contention, the district court focused on the reach, rather than the substance, of the 2019 Settlement and concluded that it is "not binding on the plaintiff Funds" and does not "preclude the Funds from seeking delinquent contributions from Stromberg." *See* Summary Judgment Order 15. We take the same approach and reach the same conclusion.

Notably, Stromberg has identified just one case in which a court has determined that a settlement agreement between a union and an employer precluded a non-party benefit fund from suing the employer to recover delinquent contributions pursuant to ERISA. *See Trs. of Constr. Indus. & Laborers Health & Welfare Tr. v. Interstate Hotel Installation*, No. 2:12-cv-00353, 2013 WL 820000 (D. Nev. Mar. 5, 2013). Of course, that decision is not binding on us. Nor is it persuasive. Indeed, it is inconsistent with our controlling precedents — the very precedents invoked by the district court in its Summary Judgment Order.

Those precedents have recognized that multiemployer benefit plans "necessarily do not have the same duties and interests as local labor unions or employers." *See Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, 929 F.3d 135, 140 (4th Cir. 2019). Thus, ERISA § 515 "leaves for separate litigation any matters between the employer and the union arising from their individual CBA, to which the plan was not a party." *Id.* At the same time, § 515 "strengthens the position of multiemployer plans by

18

holding employers and unions to the literal terms of their written commitments." *See Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1021 (4th Cir. 1997). And as a consequence of § 515, "an employer is not permitted to raise defenses that attempt to show that the union and the employer agreed to terms different from those set forth in the [CBA]." *Id.*

In another decision cited in the Summary Judgment Order, a Maryland district court adhered to the foregoing principles and determined that settlement agreements between an employer and pension funds associated with local unions did not preclude other multiemployer benefit plans from pursuing delinquent contributions from the employer under ERISA § 515. *See Int'l Painters & Allied Trades Indus. Pension Fund v. Madison Coatings Co.*, No. 1:17-cv-01559, 2019 WL 5625759, at *4 (D. Md. Oct. 31, 2019). The Maryland district court explained that "[t]he law is clear that [the plaintiffs] are permitted to purse their unpaid contributions from [the employer], irrespective of any agreement that [the employer] may have reached with local union chapters or pension funds associated with local union chapters." *Id.* (citing *Ralph's Grocery*, 118 F.3d at 1021).

Here, the district court agreed and explained "that the law in this circuit clearly sets out that the settlement agreements between Local 5 and Stromberg" — particularly the 2019 Settlement — "are not binding on the plaintiff Funds nor do they preclude the Funds from seeking delinquent contributions from Stromberg." *See* Summary Judgment Order 15. We, in turn, agree with the district court and thus affirm its liability ruling, awarding

19

summary judgment to the Funds with respect to the matter of Stromberg's liability for the underpayment of contributions.[7]

## B.

### 1.

Turning to damages, defendant Stromberg pursues the same primary arguments that it raised in the district court. Stromberg's contentions include that the plaintiff Funds cannot rely on the "default" staffing ratio set forth in the CBA to show the contributions owed, and that, even if the Funds can rely on some "default" ratio, they must use the modified ratio in the Resolution 78 Agreements regarding the Mary Ellen Jones and New Bern Projects (the sixth and ninth contested issues addressed in the Summary Judgment Order). Analyzing those arguments together, we conclude that the district court correctly ruled against Stromberg on each of them.

### a.

As the district court recognized, "ERISA requires employers to maintain records with respect to each employee sufficient to determine any benefits which are or may

---

[7] Without supporting authority, Stromberg suggests that the 2019 Settlement is nevertheless binding on the Funds because they had representatives at the December 2018 meeting wherein Local 5 and Stromberg hammered out terms of their eventual settlement agreement. *See* Br. of Appellant 44-45 (emphasizing that the 2019 Settlement "was reached under the eyes of [the Funds'] representatives"); *see also id.* at 48 (asserting that the Funds "can hardly claim they were not fully aware of the [2019 Settlement]"). We also agree with the district court, however, that the presence of the Funds' representatives at the December 2018 meeting "is immaterial." *See* Summary Judgment Order 15 n.5. Simply put, the Funds' advance knowledge of terms of Stromberg and Local 5's agreement does not somehow bind the Funds to the 2019 Settlement.

become due." *See* Summary Judgment Order 18 (citing 29 U.S.C. § 1059(a)(1)).[8]   The court also discerned, with the guidance of another North Carolina district court, that the recordkeeping requirement "affects evidentiary burdens such that, when a plaintiff demonstrates the defendant's failure to comply . . . , the burden of proving the accuracy of employment or benefit records shifts to the defendant." *Id.* at 18-19 (alteration in original) (quoting *Colin v. Marconi Com. Sys. Emps.' Ret. Plan*, 335 F. Supp. 2d 590, 606 (M.D.N.C. 2004)).

Although we have not previously considered the implications of ERISA's recordkeeping requirement in an action for delinquent contributions, several of our sister courts of appeals have concluded that — where a plaintiff benefit fund has demonstrated that the defendant employer failed both to pay contributions owed and to maintain pertinent records — the burden shifts to the employer to prove the precise amount of damages.  And if the employer cannot do so, the plaintiff fund is entitled to a damages award in an amount approximated as a matter of just and reasonable inference.  *See Combs v. King*, 764 F.2d 818, 825-27 (11th Cir. 1985); *Brick Masons Pension Tr. v. Indus. Fence & Supply, Inc.*, 839 F.2d 1333, 1337-39 (9th Cir. 1988); *Mich. Laborers' Health Care Fund v. Grimaldi Concrete, Inc.*, 30 F.3d 692, 695-97 (6th Cir. 1994).

---

[8] Section 1059(a)(1) of Title 29 provides that, subject to specified exceptions, "every employer shall, in accordance with [pertinent regulations], maintain records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees."

That interpretation of ERISA "finds strong support in" the Supreme Court's decision in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946), *superseded by statute on other grounds*, concerning a similar recordkeeping requirement in the Fair Labor Standards Act of 1938. *See Brick Masons*, 839 F.2d at 1338; *see also Combs*, 764 F.2d at 826-27; *Grimaldi Concrete*, 30 F.3d at 697. Deciding who bears the burden of proof when an employee sues his employer under the Fair Labor Standards Act for unpaid compensation, the *Anderson* Court pronounced (in a passage worth quoting in full):

> When the employer has kept proper and accurate records the employee may easily discharge his burden by securing the production of those records. But where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes a more difficult problem arises. The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act. In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

> The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of [the Fair Labor Standards] Act. And even where the lack of accurate records grows out of a bona fide mistake as to whether certain activities or non-activities constitute work, the employer, having received the benefits of such work, cannot object to the payment for the work on the most accurate basis possible under the circumstances. Nor is such a result to be condemned by the rule that precludes the recovery of uncertain and speculative damages. That rule

22

applies only to situations where the fact of damage is itself uncertain.  But here we are assuming that the employee has proved that he has performed work and has not been paid in accordance with the statute.  The damage is therefore certain.  The uncertainty lies only in the amount of damages arising from the statutory violation by the employer.  In such a case it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.  It is enough under these circumstances if there is a basis for a reasonable inference as to the extent of the damages.

*See* 328 U.S. at 687-88 (citations and internal quotation marks omitted).

In the words of the Ninth Circuit, the *Anderson* Court's "reasoning applies with equal force to cases arising under ERISA."  *See Brick Masons*, 839 F.2d at 1338.  Thus, where it was "undisputed that the [plaintiff benefit funds] received no contributions for work performed by [35 brick] masons even though they did some covered work during the relevant time period," and where the plaintiff funds were "unable to prove the extent of such work because of [the employer's] failure to keep adequate records," it became the employer's burden "to come forward with evidence of the extent of covered work performed by the 35 [masons]."  *Id.* at 1338-39.  And because the employer failed to come forward with any such evidence and thereby satisfy its burden at trial, the plaintiff funds were "entitled as a matter of law to recover contributions for all hours worked by these 35 masons during the quarter in which they were shown to have performed some covered work for [the employer]."  *Id.* at 1339.

In a similar action for unpaid contributions on covered work, the Sixth Circuit confronted an employer who "provided no records at all with respect to 80% of the work performed under the [CBA], and . . . incomplete records with respect to the remaining 20%."  *See Grimaldi Concrete*, 30 F.3d at 696.  Although the CBA "require[d] a calculation

23

of benefits owed based on the precise number of hours worked by properly classified laborers on covered projects," the records produced by the employer did "not set forth the hours worked on covered projects, nor [did the records] specify which laborers were working on those projects." *Id.* As such, like its counterpart in *Brick Masons*, the employer was "liable for contributions on all hours worked during [the] period in which it ha[d] been demonstrated that some covered work was performed." *Id.* at 697 (affirming the district court's conforming post-trial judgment in favor of the plaintiff funds).

For its part, the Eleventh Circuit recognized that plaintiff funds could rely on estimates of hours worked in the absence of trustworthy employer records. *See Combs*, 764 F.2d at 820-21, 825-27 (discussing the patently unreliable records presented by the employer, as well as the third-party audit and other "significant probative evidence" submitted by the plaintiff funds in support of their estimates). The Eleventh Circuit thus disagreed with the court below, which, despite the employer's "incredible" assertions, had awarded her summary judgment on the mistaken view that it was the plaintiff funds' burden to prove the precise amount of damages. *Id.* Rather than directing entry of judgment in favor of the plaintiff funds, however, the court of appeals vacated and remanded for the district court to consider in the first instance whether the employer had shown that the plaintiff funds' estimates were inaccurate or otherwise unreasonable. *Id.* at 827 (specifying that the district court should address the employer's "contention that the [plaintiff funds] did not present sufficient evidence to show the amount of hours worked as a matter of just and reasonable inference").

24

b.

Here, the district court's determination that the plaintiff Funds can rely on the CBA's "default" staffing ratio to show the contributions owed — along with the court's conclusion that the Funds need not rely instead on the modified ratio in the Resolution 78 Agreements — is consistent with *Anderson*, *Combs*, *Brick Masons*, and *Grimaldi Concrete*. That is, the court essentially ruled that — because of defendant Stromberg's failures to pay all contributions owed, to maintain pertinent records, and to prove the precise amount of damages by some other evidence — the Funds are entitled to a damages award in an amount approximated as a matter of just and reasonable inference. Under the Summary Judgment Order, the CBA's "default" ratio constitutes the Funds' means of approximation. And the Funds need not rely instead on the Resolution 78 Agreements' modified ratio due to the absence of records specifying hours worked on the relevant Mary Ellen Jones and New Bern Projects.

We endorse the use herein of the burden-shifting approach adopted by *Anderson*, *Combs*, *Brick Masons*, and *Grimaldi Concrete*, as well as the consistent pronouncements of the district court. Concomitantly, we reject Stromberg's efforts to convince us of error in the Summary Judgment Order with respect to these issues.[9]

---

[9] To be clear, at this point we are saying only that the Funds can rely on the CBA's "default" staffing ratio as the means to approximate the amount of contributions owed. We are not saying that the Funds made *accurate and reasonable* use of the CBA's ratio in devising the approximation presented to the district court. That is an issue we address *infra*.

25

For example, Stromberg suggests that it can prove the precise amount of damages because the temporary sheet metal workers qualified only as "classified" employees, i.e., the lowest classification of worker. *See* Br. of Appellant 25 (asserting without evidence that the temporary workers "were all Classified employees"). Alternatively, Stromberg suggests that the Funds or their third-party auditor should have inquired of Local 5 and the plaintiff Sheet Metal Workers' Union Training Fund of North Carolina whether any temporary worker had been classified as a "journeyman," "apprentice," or "pre-apprentice." *See id.* at 26 (insisting that, if the Funds and the auditor "truly did not know" any temporary workers' classifications, "all [they] had to do was send a list of names" to the classifying authorities). Obviously, however, Stromberg thereby seeks to improperly excuse itself from both *its* unfulfilled obligation under the CBA to refer temporary workers to the union hall for classification and *its* burden to produce evidence establishing the precise amount of damages.

Stromberg also contends that the Funds cannot rely on the CBA's "default" staffing ratio to show the contributions owed because the ratio is simply "aspirational" and "established for completely unrelated purposes," and it does not reflect the "actual classifications" of employees on which the CBA expressly requires contributions to the Funds to be made. *See* Br. of Appellant 39. Stromberg goes so far as to argue that the Funds lack Article III and statutory standing to "enforce" the CBA's staffing ratio. *Id.* at 38-44. Fatal to Stromberg's theory, the Funds are not seeking to "enforce" the CBA's ratio, i.e., they are not seeking to require Stromberg to actually adhere to the ratio and staff its projects accordingly, nor are the Funds requesting damages for Stromberg's past failures

26

to do so. Rather, left without evidence of the exact amount of delinquent contributions because of Stromberg's recordkeeping lapses, the Funds merely seek to use the CBA's ratio as a means to approximate how much it is owed.

Lastly, Stromberg maintains that if the Funds can rely on any "default" staffing ratio, it must be the modified ratio in the Resolution 78 Agreements (a 1-to-4 ratio, more favorable to Stromberg than the CBA's 1-to-2 ratio). In so arguing, Stromberg does not dispute that it does not have records specifying the hours worked by the temporary sheet metal workers on the relevant Mary Ellen Jones and New Bern Projects. Rather, Stromberg suggests that it can demonstrate that the majority of the temporary workers' hours were spent on the Mary Ellen Jones and New Bern Projects because those were the only "major" projects at issue. According to Stromberg, the modified ratio set forth in the Resolution 78 Agreements should thus be used as to all of the temporary workers' hours. Without records reflecting the exact number of hours worked on the Mary Ellen Jones and New Bern Projects, however, Stromberg cannot hold the Funds to the modified ratio. *Cf. Grimaldi Concrete*, 30 F.3d at 697 (deeming the employer liable, in the absence of precise records concerning covered work, "for contributions on all hours worked during [the] period in which it ha[d] been demonstrated that some covered work was performed"); *Brick Masons*, 839 F.2d at 1339 (similar).

## 2.

In challenging the district court's damages ruling, defendant Stromberg also targets the court's conclusion that Stromberg did not proffer sufficient evidence in these proceedings to create a genuine issue of material fact as to the amount of damages and the

27

accuracy of the Funds' determination thereof (the eighth contested issue addressed in the Summary Judgment Order). On this point, we agree with Stromberg that the district court erred.

Under the authorities we endorse herein, the plaintiff Funds are entitled to approximate their damages based on the CBA's "default" staffing ratio — but Stromberg is yet entitled to contest the reasonableness of the Funds' approximation. In other words, although Stromberg has lost its broad challenge to the Funds' use of the CBA's ratio, Stromberg can still contest the Funds' *inaccurate and unreasonable* use of that ratio. *See Anderson*, 328 U.S. at 687-88 (explaining that it is the employer's burden "to come forward with evidence of the precise amount of work performed *or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence*" (emphasis added)); *Combs*, 764 F.2d at 827 (recognizing that the plaintiff funds could rely on estimates of hours worked, but remanding for further proceedings on the employer's "contention that the [plaintiff funds] did not present sufficient evidence to show the amount of hours worked as a matter of just and reasonable inference").

Significantly, as another court of appeals has explained, the authorities we endorse herein did not hold "that an employer's failure to maintain adequate records compels summary judgment against it." *See Ill. Conf. of Teamsters & Emps. Welfare Fund v. Steve Gilbert Trucking*, 71 F.3d 1361, 1367 (7th Cir. 1995) (emphasis omitted). Rather, the employer may survive a summary judgment motion by pointing to evidence "that would cast doubt upon the accuracy of the [plaintiff fund's damages estimate]" — and by thereby showing a genuine dispute of material fact. *Id.*

28

To be sure, Stromberg has not — as the district court recognized — proffered "specific, documentary evidence" that would be sufficient to satisfy its ultimate burden of proving the unreasonableness of the Funds' damages approximation. *See* Summary Judgment Order 18 (internal quotation marks omitted). But Stromberg is not required to do so at this juncture. Rather, Stromberg need only point to enough evidence to cast some doubt on the accuracy of the Funds' damages approximation, and it has done so by way of evidence that there are computational and methodological errors in the Funds' third-party audit and application of the CBA's 2-to-1 staffing ratio. *See, e.g.*, J.A. 2049 (declaration of Stromberg owner/employee Kathleen Bigelow that "[t]hroughout the audit process," she "point[ed] out errors in the auditor's calculations and assumptions," and that "[a]fter the litigation began," she "prepared further documentation to show the errors" and "produced [those documents] to [the Funds] in discovery").

In these circumstances, although we have concluded that the Funds are entitled to rely on the CBA's "default" ratio to approximate their damages, we also recognize that Stromberg is entitled to challenge the accuracy and reasonableness of the Funds' approximation and has proffered sufficient evidence of computational and methodological errors to survive the Funds' motion for summary judgment. We therefore vacate the district court's damages ruling, awarding summary judgment to the Funds on their claim for

damages in the amount requested. In so doing, we remand for further proceedings regarding the adequately disputed damages issue.[10]

## IV.

Pursuant to the foregoing, we affirm the district court in part, vacate in part, and remand for such other and further proceedings as may be appropriate.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*

---

[10] Our remand renders it unnecessary to reach and address another contention pursued by Stromberg in this appeal: that the Funds cannot rely on their third-party audit to establish the amount of delinquent contributions because the audit constitutes "inadmissible hearsay" (the seventh contested issue addressed in the Summary Judgment Order). The Funds deny that the audit constitutes inadmissible hearsay but assert that any inadmissibility problem could easily be fixed. Meanwhile, Stromberg seems to prefer to stand on a seemingly unpreserved authenticity argument, rather than its hearsay contention. We leave those damages-related evidentiary issues for the district court to revisit or newly address as it deems appropriate in the remand proceedings.